551 A.2d 923

ADMIRAL INSURANCE COMPANY

v.

JOHN STROMBERG AND ASSOCIATES, et al.

No. 632, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Jan. 11, 1989.

Joseph F. Cunningham (Paul V. Crawford and Joseph F. Cunningham & Associates, on the brief), Washington, D.C., for appellant.

Barbara Lee Ayres (Whiteford, Taylor and Preson and Tricia D. O'Neill, on the brief) Towson, for appellees, Henry H. Housman, III and Black Hat Bar and Restaurant, Inc.

John M.G. Murphy (Edward J. Hutchins, Jr. and Eccleston and Seidler, on the brief) Baltimore, for appellees, John Stromberg and Associates, Inc. and J. Donald Walters.

Argued before WILNER, GARRITY and POLLITT, JJ.

WILNER, Judge.

It is fair to say that no one is entirely satisfied with the disposition of this case in the Circuit Court for Baltimore City; everyone has appealed.

The dispute arises out of a fire that occurred in the early morning hours of February 22, 1985, at 405 South Caton Avenue. The building was owned by the plaintiff Henry Housman III and was used principally as a tavern which Mr. Housman operated through a corporation known as

Black Hat Bar & Restaurant, Inc.[1] In addition to the tavern, there were six rooms located on the second and third floors of the building that Mr. Housman rented out on a weekly basis. The damage to the building and its contents was appraised at over $136,700. The loss of rentals, by the time of trial, was estimated to be nearly $34,000.

The controversy is not over the fire or the amount of damage; it is over who pays for the loss.

### (1) *Underlying Facts*

Since 1981, Mr. Housman obtained insurance on the property through J. Donald Walters, an agent employed by John Stromberg & Associates. The most recent policy procured by Walters was issued by Admiral Insurance Company. Walters actually procured the policy through a surplus lines broker known as All Risks, Ltd., which, in turn, obtained it through Admiral's general agent, W.B. Richey & Company, Inc. The policy, by its terms, was in effect from February 6, 1984, through 12:01 a.m., February 6, 1985. It insured the building for $40,000 and the contents for $30,000. The annual premium was $1,250, which Mr. Housman paid in periodic installments through a premium financing arrangement.

Md.Ann. Code art. 48A, § 240A(a)(3) provides, in relevant part, that:

> "The insurer shall see that written notice of intention ... not to renew a policy issued in this State is sent to the insured not less than 45 days prior to the date of the ... expiration of the policy.... Notice given the insured by an insurance broker or agent on behalf of the insurer shall be deemed to have been given by the insurer for the purposes of this subsection; provided, however, that no such notice shall be required where the agent or broker has replaced the insurance."

---

1. Although both Mr. Housman and his corporation are parties to this action, their interests are more or less the same, and so for convenience we shall refer only to Mr. Housman.

In May, 1984, Admiral informed Richey that, effective August 10, 1984, Richey's authority to write policies for Admiral would terminate. With or without a view toward the requirements of § 240A(a)(3), Admiral agreed "not to send notices of nonrenewal on any of Mr. Richey's business in return for which he agreed to replace that business at other markets of his choice." Admiral's restraint, according to its property underwriter, was as a courtesy to Richey —"so that the insureds would not be upset and thereby possibly go to another retail agent who did not have the same relationship with Mr. Richey." As a consequence of its termination of Richey's authority, Admiral would not have renewed Mr. Housman's policy upon its expiration.

Exactly what transpired between August, 1984, when Admiral made effective its decision not to renew Mr. Housman's policy, and February 6, 1985, when the policy expired, is in some dispute. Bonnie Huber, an underwriter for All Risks, Ltd., testified that, beginning about 45 days prior to the expiration date, she tried to get a quotation from Richey on a renewal policy, but, despite two or more telephone calls, she received no response until January 30, 1985. On that day, she received a telex message from Richey offering a policy containing the same coverage as the Admiral policy from Mt. Hawley Insurance Co. The premium on the Mt. Hawley policy, however, was substantially greater than that on the Admiral policy—$1,924 as opposed to $1,250. The brief telex message from Richey did not explain how the premium was calculated or why it was so much higher than the Admiral premium. In her testimony, Ms. Huber attributed the increase to two causes—the fact that "the construction was frame instead of brick and there was cooking [on the premises] which is more of an exposure." She did not indicate, nor does the record otherwise show, how much of the increase arose from either of those conditions.

When Ms. Huber received the message from Richey, she called Mr. Walters and informed him of the quotation and then sent him a written "policy renewal notice" offering a

renewal policy at the $1,924 premium. Ms. Huber claimed that the telephone call and delivery of the written notice occurred on January 30—the same day on which she got the message from Richey. Walters testified that he did not receive the call or the notice until February 4—one day before the policy was due to expire.[2]

While these various messages were passing through the chain of brokers and agents, Mr. Housman remained in blissful ignorance of his impending predicament. No one notified him that the Admiral policy was not going to be renewed until after Walters received the telephone call from Ms. Huber. Indeed, when Mr. Housman once inquired, in December, 1984, about when his next premium payment would come due, he was told by someone in Stromberg's office, "don't worry they will get in touch with you."

What happened next is also in some dispute. Walters claimed that he tried to reach Housman on February 4, 5, and 6, each time leaving a message with someone at the bar. He finally made contact on February 7, at which time he gave Housman the new figures and told him that, to obtain coverage, Housman would have to pay a 30% deposit on the premium and sign a premium finance agreement. The next day, Housman informed Walters that he wanted to obtain a quotation from someone else—that he thought the premium was too high.

Walters said that he called Housman three more times— on the 11th, the 14th, and the 19th—each time warning Housman that he was without insurance. Finally, on the afternoon of February 20, Mr. Housman came to Walters' office and told him that he wanted to alter the insurance

---

**2.** The policy renewal notice sent to Mr. Walters indicates that the existing Admiral policy, identified by number, was being renewed. There is no reference on the notice to Mt. Hawley Insurance Co., and Mr. Walters testified that he read the notice as indicating that Admiral would be renewing the policy at a higher premium. Ms. Huber said that the form notice had been computer-generated in August, 1984 but held by her until she finally got the quotation from Richey.

coverage from $40,000 on the building and $30,000 on the contents to $75,000 on the building and $15,000 on the contents. Walters called Ms. Huber the next day, got a quotation from her on that coverage, and relayed it promptly (about 10:30 a.m.) to Mr. Housman. Housman said that he would come to Walters' office by 3:00 that day, Walters explaining that he would not be in the office after 3:00. When Housman did not show up by 3:00, Walters left. The insurance was not obtained; the fire occurred that night.

Mr. Housman told a somewhat different story, one that the jury obviously accepted. He said that several months earlier Walters had told him that he was going to try to place the insurance with another company "and save you a lot of money." He heard nothing more until February 10, when Walters called him at the bar, berated him for not returning earlier calls that Housman said he never received or knew about, and informed him that, instead of the premium going down, it would increase by several hundred dollars. When Housman protested, Walters replied:

"[I] have lost four or five customers already. He says if you don't believe me, he says shop around and see for yourself. I said Don shop around, I don't have any time to shop around now. You tell me I am without insurance. I don't want to be without insurance.

So he says, oh, well, he says you shop around, he says I can hold you for a few days."

Following this conversation, Housman contacted another agent, who suggested that he was underinsured on the building and overinsured on the contents and recommended, ultimately, increasing the one to $75,000 and decreasing the other to $15,000. After several days, the agent quoted a premium for such coverage that was considerably higher than the $1,924 offered by Walters. Shortly thereafter, on February 20, Walters called again. According to Housman:

"[I] told him about what I wanted, about the increase and he sit down there and he said I told you you should have more insurance on that building and all. I said I don't remember you saying that. Anyhow, that is what I

wanted. So I said to him can you give me a price on that. He said I will get back to you."

The next morning—the 21st—Walters called and gave Housman a price on the $75,000/$15,000 policy. Housman said he would stop by Walter's office with the money between 3 and 4 o'clock; Walters said he would be there all day. When Housman went to the office, however, before 4:00, Walters was not there. One of the employees told Housman that Walters left "early this morning. He hasn't returned and he hasn't called back all day." Housman explained that he had come to drop off a deposit but didn't know the exact amount due. Neither did the employee, who said that Walters had taken all the papers with him and that "there is nothing I can do." Housman called back to Stromberg's office later and was told that Walters had not returned. That, according to Housman, is why he had no insurance in effect when his building caught fire later that night.

### (2) *Proceedings In The Circuit Court*

Seeking recompense for his loss, Housman and his corporation sued Admiral, Stromberg, and Walters. The action against Admiral was based on the statutory requirements of art. 48A, §§ 240A(a)(3) and 240B.[3] Section 240A(a)(3), as noted earlier, requires an insurer opting not to renew an existing policy to see that written notice of its intention not to renew is sent to the insured at least 45 days prior to the expiration of the policy unless the insurer's broker or agent has either given such notice itself or has replaced the insurance.

Section 240B(a) provides a correlative duty on the part of an insurer to "provide each policyholder with a notice of renewal premium due at least 17 days in advance of the due

---

**3.** At the time the action was filed, the provisions now in § 240A(a)(3) were codified as § 240A(c) and so some of the papers and argument in the Circuit Court used that reference. The section was rewritten in 1987, and subsection (c) became subsection (a)(3), without substantive change. *See* 1987 Md. Laws, ch. 455. For convenience, we shall use the current reference.

date, unless a notice of intention not to renew has been furnished in compliance with [§ 240A]." Subsection (b) of § 240B then states:

"If there is a failure to discharge the duty set forth in subsection (a) of this section, and thereafter the policyholder fails to make timely payment of the renewal premium the insurer must:

(1) Provide coverage for any claim which would have been covered under the policy, if it arises within 45 days after the date the insured discovers or should have discovered that his policy has not been renewed; and

(2) Renew the policy upon tender of payment, provided the tender is made within 30 days after the policyholder discovers or should have discovered that his policy has not been renewed."

At some point following the fire—just when is not clear—Housman tendered payment of the premium to Stromberg, and it was refused.

The theory of Housman's action against Admiral, then, was that, by failing to provide the required 45–day notice of intention not to renew (or the 17–day notice of premium renewal), it remained liable for the loss notwithstanding the expiration of the policy.[4]

The action against Walters and Stromberg was based on negligence and breach of contract. In Count 3, Housman alleged a negligent failure to bind insurance on terms agreed to by Housman on February 21, 1985; Count 4 charged breach of an agreement to bind that insurance.

Early in the proceeding, Admiral cross-claimed against Walters and Stromberg, asserting that, if Admiral was liable to Housman by reason of any of their acts or omis-

---

4. Liability based on these statutes was pled in Count 1 of the Amended Complaint. In Counts 2, 5, and 6, Housman sought to hold Admiral vicariously liable for the acts of Walters on the theory of agency. At the close of the plaintiffs' case, the court dismissed those counts, finding insufficient evidence of agency. That finding is not challenged in this appeal.

sions, they would be liable to Admiral for either indemnity or contribution. Stromberg and Walters responded in kind with a cross-claim of their own, contending that, by failing to provide the statutorily required notice, Admiral was solely responsible for the loss suffered by Housman. They too thus sought indemnity and contribution.

There was never any serious question that Admiral failed to give the written notice required by § 240A. Indeed, no one gave Housman the required notice. Admiral's principal defense was that, by procuring an offer from Mt. Hawley of a policy meeting the altered coverage sought by Housman, its agent Richey had effectively "replaced" the expiring Admiral policy and that the nonrenewal notice was therefore not required.

That issue, along with the questions implicit in Housman's actions against Walters and Stromberg, was submitted to the jury which, in special verdicts, found that (1) Admiral had *not* provided replacement coverage through Richey, (2) Walters and Stromberg had breached a contract with Housman, (3) they were also negligent in their dealings with Housman, and (4) Housman was not guilty of either contributory negligence or assumption of risk. The jury awarded damages of $90,000 against Admiral and $36,000 against Walters and Stromberg.

The jury's verdicts produced four post-judgment motions, three of which concerned Housman's claim against Admiral, as set forth in Count 1 of his amended complaint. In that count, as noted, Housman asserted that, by failing to give him the written notice required by §§ 240A or 240B, Admiral was responsible to provide coverage "as provided in Section 240(B)(b)(1) [*sic*, the reference intended was § 240B(b)(1)]." The relief prayed was that the court declare that Admiral "must provide coverage for any claims arising from the fire of February 22, 1985 which would have been covered under Admiral's Special Multi–Peril Policy previously issued to [Housman]."

Both Housman and Admiral saw a defect in that part of the pleading; Housman sought to correct the defect, Admiral to take advantage of it. In a motion for Judgment NOV, Admiral noted that no damages were sought in Count 1, only a declaration that it was liable on the expired policy, and it therefore argued that, as damages were not sought, they should not have been awarded. In a separate motion to revise the judgment, Admiral repeated that argument but claimed further that, as the policy it had issued had a coverage limit of $70,000 ($40,000 for the structure, $30,000 for the contents), and as its obligation under § 240B(b) was simply to provide coverage for any claim "which would have been covered under the policy" or to "[r]enew the policy upon tender of payment," its liability could not exceed $70,000. On that ground, it asked for a *remittitur* of $20,000.

Housman sought to retain that extra $20,000. In a motion for leave to amend his complaint "to conform to the evidence," he urged that the section he really meant to plead was not § 240B(b) but rather § 240D. Section 240D states, in relevant part, that:

"If an insurer fails to comply with any provision of §§ 240A, 240AA, 240B, or 240C, such insurer shall be liable to the applicant for the coverage *which was requested, or which would have become effective except for the failure to comply with these sections,* unless the person seeking coverage no longer wishes the coverage, has obtained other substantially equivalent coverage, or fails to tender or pay the premium after reasonable demand therefor has been made. Such liability is in addition to any other penalties applicable pursuant to law."

(Emphasis added.)

In the belief that § 240D would make the imputed liability equivalent to the $90,000 of coverage ultimately *requested* by Housman, rather than the $70,000 actually provided in the expired policy, Housman asked in his post-judgment motion for leave to amend Count 1 to assert liability under

§ 240D. In support of his motion, he pointed out that, in its instructions to the jury with respect to Count 1, the court used the standard and the language of § 240D, rather than that of § 240B(b), and thus argued that the jury's verdict was therefore entirely consistent with the court's instructions.

The fourth motion, also by Admiral, was for judgment on its cross-claim against Walters and Stromberg. Noting that the jury had found those two defendants guilty of both negligence and breach of contract for failing to bind the insurance tendered to Houseman on February 21, Admiral contended that that dereliction was the proximate cause of both Housman's loss and Admiral's statutory liability. Walters and Stromberg did not file a post-judgment motion, although, at the close of the evidence they had, without success, moved for judgment against Admiral on their cross-claim for contribution or indemnification.

The court granted Admiral's motion for *remittitur* but denied all other aspects of the post-judgment motions. Judgment was thus entered for Housman in the amount of $70,000 against Admiral and $36,000 against Walters and Stromberg.

### (3) *Appeals And Cross–Appeals*

As we observed, no one is entirely happy with that result. Admiral has appealed from both the $70,000 judgment entered against it and the denial of its cross-claim against Walters and Stromberg. Those defendants, on the other hand, have cross-appealed from the denial of their cross-claim against Admiral. And, not to be left without a cause, Housman and his corporation have appealed from the denial of their motion to conform their pleading to the evidence, i.e., the loss of the $20,000.

### (4) *Admiral vs. Housman*

Admiral's defense to the claim by Housman hinges on the meaning of the word "replaced," or, more appropriately, the words "has replaced," as used in § 240A(a)(3). The obligation to see to it that written notice of an insurer's

intention not to renew a policy is sent to an insured at least 45 days prior to expiration of the policy does not come into play if the agent or broker "has replaced the insurance." Admiral views this language as not requiring the actual issuance of a new replacement policy but merely the offering of one, the undertaking to issue one. On that premise, it argues that, when, in response to All Risk's request, Richey offered the policy from Mt. Hawley on January 30, 1985, the insurance was "replaced" and Admiral was excused from any requirement to send, or see to the sending of, a notice of nonrenewal. We reject the premise, and thus the conclusion drawn from it.

The word "replace," especially in a legal context, "is generally defined to mean the 'restoring to a former condition,' or 'the providing of an equivalent for.' " *Piazza v. Clackamas Water District*, 21 Or.App. 469, 535 P.2d 554, 557 (1975), quoting from Black's and Webster's dictionaries. It means to "supplant with a substitute or equivalent," *Olenick v. Government Employees Insurance Co.*, 42 A.D. 2d 760, 346 N.Y.S.2d 320, 321 (1973), to "put something in the place of something else." *Wade v. Lewis*, 561 F.Supp. 913, 937 (N.D.Ill.1983). The word ordinarily connotes an event—the actual substitution or restoration—and not merely a proposal or offer to substitute or restore. That connotation, we think, is clearly appropriate in terms of § 240A.

Section 240A has to be read not only in an historical context but *in pari materia* with related statutes. Such a reading makes clear that the Legislature did not intend for the section to be read as Admiral suggests.

The statute was first enacted in 1965. *See* 1965 Md. Laws, ch. 778. It applied then only to motor vehicle liability policies and required that, before any such policy was cancelled other than for nonpayment of premiums, the insurer send a specific notice, set forth in the statute, informing the insured, among other things, that (1) the insurer "does not desire to carry automobile liability insurance for you any longer" and (2) "you should immediately

contact an agent or broker for other insurance or request insurance through the Maryland Assigned Risk Plan" which "affords eligible persons the right to obtain liability insurance at a somewhat increased premium."

The next year, § 240A was amended to broaden the content of the required notice. In new subsection (d)—the initial precursor of current § 240A(a)(3)—the Legislature required insurers to "see that written notice of intention . . . not to renew a policy of motor vehicle liability insurance" was sent to the insured at least 30 days prior to the proposed expiration of the policy. The new subsection further added the language at issue here: that notice given by a broker or agent on behalf of the insurer would be deemed to have been given by the insurer and that "no such notices shall be required where the agent or broker has replaced the insurance." Coupled with that notice had to be the further notice, already required, of the insured's "possible right to replace such insurance through the Maryland Automobile Insurance Plan." *See* 1966 Md.Laws, ch. 218.

As it was the 1966 enactment that introduced both the concept and the language at issue here, we need to give some attention to the legislative purpose at that time. The requirement, as we indicated, applied only to motor vehicle liability policies, and we thus perceive a dual, rather than a singular, purpose. Clearly, the statute was intended to benefit the individual insureds, by giving them advance notice that their policy was going to be cancelled or nonrenewed and affording them a reasonable opportunity to replace that insurance, either through another company or through the "facility" then in existence for insuring substandard risks. It was also, we think, for the public benefit; by affording individual insureds this opportunity to replace their insurance and thus continue their coverage, the statute reduced the risk of injury to innocent victims by uninsured motorists.

To construe the proviso, that the notice was not required "where the agent or broker has replaced the insurance," as Admiral desires would have defeated the whole purpose of

the enactment. There was then no counterpart to current § 240B(b) or § 240D, and thus failure to give the notice would not have kept the insurer on the risk. To assume that the insurer could forgo giving the notice merely on the expectation that the existing policy might or would be replaced before its expiration would mean that, if that expectation were not realized, the insured would in fact be without insurance when the policy expired and both he and the public at large would remain at risk. We can see, then, that such a reading of that language would be wholly at cross purposes with what the Legislature intended it to accomplish.

The statute took more of its present form in 1971. By 1971 Md.Laws, ch. 436, the Legislature, in relevant part, (1) broadened § 240A to include all forms of insurance other than life or health insurance, (2) required the notice to be given 45, rather than 30, days before expiration, (3) added § 240B, requiring that insurers intending to renew policies give 17 days advance notice of the renewal premium, and providing a continuing statutory liability if they fail to do so, (4) added § 240C, requiring insurers opting to nonrenew a policy to give a statement of reasons for their action, and (5) added § 240D, providing a continuing liability in the event of a violation of §§ 240A, 240B, or 240C. We see nothing in this enactment to justify any different reading of § 240A. That section still applied to motor vehicle liability policies; indeed, it was broadened to cover other forms of liability insurance as well, and so the dual purpose of the advance notice provision implicit in the 1966 enactment remained extant. If anything, ch. 436 evidences an intent by the Legislature that insurers strictly comply with the requirement to give fair warning of nonrenewal.

The separation of the nonrenewal requirements for motor vehicle policies into a new § 240AA came in 1972 as part of a broad enactment dealing specifically with that kind of insurance. See 1972 Md.Laws, ch. 73. Nothing therein suggests that any different interpretation should be given to § 240A, however.

In this historical context, we can see one clear reason to reject Admiral's interpretation—that it would have led to a result directly contrary to what the Legislature was trying to achieve. But apart from the historical perspective, that view would make no sense even in a current context, for it would leave both insurer and insured in a very uncertain position. If the insurer fails to give the required notice on the supposition or expectation that the policy *will be* replaced, it may never know whether it remains on the risk until, as here, a loss in fact occurs. And even then, its liability and the insured's right to compensation may depend on who made an offer of replacement, when the offer was made, and whether the new policy offered was or was not the equivalent of the existing policy. If the new policy offered differs in coverage, in language, in conditions or exclusions, or in premiums, litigation is almost assured, and, as here, years could pass before the rights and obligations of the parties are determined.

We do not believe that the General Assembly intended that kind of uncertainty. We think, rather, that the obligation to send the notice is clear and fixed, and that the only exception to it is where the broker or agent, *prior to the time the notice is required to be given,* has either given the notice itself on behalf of the insurer or actually replaced the existing policy with one acceptable to the insured. Those facts are ascertainable: the agent either sent the notice or it did not; the policy has been replaced or it has not. If the notice has not been sent by the agent and the expiring policy has not been replaced, the insurer must give the 45–day notice. It then knows that it is "off the hook," but the insured then knows what he must do. The clear purpose of the statute will have been served.

That did not occur here. Admiral did not comply with the requirement of the statute, and this record reveals no legal justification for its failure to comply. The jockeying that occurred between Walters and Housman from and after February 6, 1985, is immaterial. The Admiral policy was not, in fact, replaced prior to the loss, and so Admiral

remains liable. The question is, for how much? The answer is $70,000.

As we observed, Housman's quest for the additional $20,000 is based entirely on § 240D—in particular the provision that, if an insurer fails to comply with any provision of §§ 240A, 240AA, 240B, or 240C, it shall be liable "to the applicant for the coverage which was requested, or which would have become effective except for the failure to comply with these sections...." His view is that, as he ultimately "requested" insurance totaling $90,000, that is the measure of Admiral's liability. We do not agree.

Section 240D is a peculiar provision in a number of ways. It obviously was intended to have some relationship with the sections to which it refers, but the nature of the relationship is somewhat unclear. It speaks of liability to "the applicant" but does not define "applicant." The only section referred to in § 240D that uses the term "applicant" is § 240C, which requires an insurer, upon request, to inform an "applicant" of the reasons for its decision to cancel or nonrenew a policy. In that context, § 240C(a) defines "applicant" as the person seeking to purchase (or renew or reinstate) a policy.

A relationship between those two statutes is discernible. As no other sanction is provided in § 240C, it may well be that what the Legislature had in mind was to invalidate the cancellation or nonrenewal if, upon a proper request, the insurer failed to give the reasons for its action. In that sense—if the cancellation or nonrenewal is ineffective—it would follow that the insurer would be liable to the "applicant" for the coverage which "was requested" (if a reinstated policy was involved) or which "would have become effective except for the failure to comply" (if an existing policy was involved).

A similar, though more tenuous, connection may exist with § 240B, although (1) that section does not speak of an "applicant" and (2) it provides its own remedy for a viola-

tion. There is even more of a gap in trying to fit §§ 240D and 240A together, however.

Section 240A does not speak of an "applicant" and does not speak of any coverage "which was requested" or which "would have become effective except for the failure to comply...." It simply requires advance notice of a decision to cancel or nonrenew. A complete remedy for non-compliance with *that* requirement is set forth in § 240B. If the insurer fails to give the notice required by § 240A, it is obliged to renew the policy. Subsection (a) of § 240B makes that clear by requiring the insurer to give notice of the renewal premium. If it fails to do that as well, § 240B(b) requires the insurer (1) to continue coverage for any claim which would have been covered under the policy if its arises within 45 days after the insured discovers that the policy was nonrenewed and (2) to actually renew the policy upon a timely tender of the premium. That is a clear, rational scheme which fully and fairly remedies the violation.

What § 240D adds in this context is a mystery. Under Housman's view, an insured who fails to receive the required notice would be in a better position than one who received the notice, for, by requesting *more* coverage, he could bind the insurer to coverage that was not included in the expiring (or expired) policy and which the insurer would be unwilling to provide to the insured or to anyone else. It would allow the insured, in effect, to write the new policy, adding or increasing coverages, eliminating conditions and exclusions. We do not believe that the Legislature intended that result. See *Parsons v. Erie Ins. Group,* 569 F.Supp. 572 (D.Md.1983), where, at 575 n. 10, the Court construed § 240D as providing that, if the insurer violates the requirements of the other sections, "the insurer will be viewed as continuing to provide *the cancelled coverage.*" (Emphasis added.) *Cf. Government Employees Ins. v. Ropka,* 74 Md.App. 249, 274, 536 A.2d 1214 (1988).

Section 240D can be read harmoniously with the other sections to which it refers. It does provide an otherwise

unclear remedy for violations of § 240C, and, if read reasonably, it more or less confirms the remedy available for violations of §§ 240A and 240B. To reject Housman's approach, therefore, would not render the section meaningless; to adopt that approach, however, would take it beyond what we think the Legislature had in mind.

### (5) *Admiral vs. Walters and Stromberg*

We turn now to the subsidiary dispute among the defendants as to who must actually pay the damages awarded to Housman—whether either is entitled to contribution or indemnity from the other.

Admiral's claim, as we understand it, is essentially this: (1) it was not negligent in this matter but is liable, if at all, only for breach of contract; (2) if it was negligent in failing to give the required notice, its negligence was merely passive or vicarious and was not the proximate cause of Housman's loss; and (3) if its negligence was in any sense active, then it, Walters, and Stromberg were joint tortfeasors and thus should share the loss equally. Walters and Stromberg obviously have a different view. The whole problem, they aver, stems from Admiral's failure to give the required notice. Had Admiral given the notice, Housman could have secured the desired coverage and "the missed appointment with Walters would have been inconsequential."

We find no merit in either approach.

■ Admiral's liability to Housman was indeed contractual in nature, but the contract was one implied by law. Because it failed to comply with a statutory requirement, the law bound it to a contract that it did not wish or intend to make. By virtue of the statute, it occupied the same position *vis a vis* Housman as if it had willingly and effectively renewed the expiring policy. Nothing that Walters or Stromberg did or did not do could change that situation. It is true that, had those defendants, or anyone else, actually procured and put in place an equivalent substitute policy on or before February 6, 1985, Admiral would

have escaped liability because its policy would not have renewed by operation of law;[5] but having created the condition of its own liability, it cannot complain that someone else failed to abrogate that liability. Admiral seems to forget that its dereliction put not only Housman but Walters and Stromberg as well in a difficult situation. It left them very little time to find a replacement policy at a competitive rate.

Admiral was certainly not innocent in this matter, as it suggests; nor was its culpability a vicarious or passive one. It became bound to a renewed contract because it knowingly and deliberately failed to comply with a clear statutory obligation. We therefore see no basis for a right of indemnity against Walters and Stromberg. And, as its liability was contractual rather than tortious in nature, it is not entitled to contribution as a joint tortfeasor.

The claim by Walters and Stromberg is a little different but has no greater merit. It seems to be in two parts. First, supporting Housman's construction of § 240D, they contend that Admiral is responsible for $90,000 of the loss, and that it is primarily responsible for that loss. Second, presuming that all or some part of the $36,000 award against them was for lost rentals claimed by Housman, they contend that those losses were the direct consequence of Admiral's refusal to honor and pay the claim promptly, and that Admiral, and not they, should be responsible for the consequential damages.

■ We note first that the basis of the $36,000 award against Walters and Stromberg is not at all clear. In its instructions, the court told the jury that, if it found those defendants liable

---

**5.** It is not clear what the result would be if a new policy had been issued *after* February 6, 1985, and Housman had paid the premium on and did nothing to cancel the renewed policy from Admiral. Absent some evidence of fraud, we see no reason why two policies could not be in force on the same building, especially where, as here, the $70,000 of coverage under the Admiral policy was apparently less than the insurable value of the property insured.

"in the amount of the policy limits on the lapsed insurance policy *or* on the new insurance policy which the plaintiffs attempted to secure, you *may also consider* whether plaintiffs are entitled to loss [sic] rents and profits which were reasonably foreseeable consequential damages arising from the defendants' breach of their legal and contractual duties to the plaintiffs."

(Emphasis added.)

That instruction would have allowed the jury to award up to $90,000 against Walters and Stromberg for the fire damage alone, and the jury may well have based all or part of its award on that loss. Clearly, under the view we take of §§ 240A, 240B, and 240D, Admiral's responsibility on the policy renewed by operation of law is limited to $70,000; the additional $20,000 is attributable directly to the negligence and breach by Walters and Stromberg. They were the ones who promised to obtain and bind $90,000 of coverage, and, although the jury incorrectly included the additional $20,000 in the award against Admiral, it may well have felt that Walters and Stromberg should also be responsible for that much of the loss. That possibility is supported by the fact that the lost rentals, even as testified to by Mr. Housman, did not quite amount to $36,000 and there was some dispute as to whether he actually lost all the rentals he claimed. We cannot presume, therefore, that the entire $36,000, or indeed that any definable part of it, represented consequential damages arising from lost rentals.

No complaint is made in this appeal about either the amount of the award against those defendants or about the basis or bases for the award. They have not asked us, in other words, to determine that the verdict against them, or any part of it, was improper; their sole urging as to that verdict is that Admiral should indemnify or reimburse them for what they must pay to Housman. Absent some clear indication of what elements were included in the award, however, there is no way that we can tell whether, or to what extent, they constitute elements for which Admiral is

primarily responsible. We therefore have no basis on which to find a right of indemnity against Admiral.

JUDGMENTS AFFIRMED; COSTS TO BE PAID ONE–HALF BY ADMIRAL INSURANCE COMPANY, ONE–FOURTH BY J. DONALD WALTERS AND JOHN STROMBERG AND ASSOCIATES, INC.; AND ONE–FOURTH BY HENRY HOUSMAN III AND BLACK HAT BAR & RESTAURANT, INC.