**AMERICAN CASUALTY COMPANY OF READING, PA., Plaintiff,**

**v.**

**RESOLUTION TRUST CORPORATION, et al., Defendants.**

Civ. A. No. MJG–92–1138.

United States District Court,
D. Maryland.

Nov. 1, 1993.

1. RTC's Motion for Partial Summary Judgment as to the 1984 Policy.

2. American Casualty's Cross–Motion for Partial Summary Judgment Under the 1984 Policy.

3. RTC's Motion for Partial Summary Judgment Based on American Casualty's Failure to Send Notice of Nonrenewal.

4. Defendant Robert E. Hecht Sr.'s Motion for Partial Summary Judgment Based on American Casualty's Failure to Send Notice of Nonrenewal.

5. American Casualty's Motion for Partial Summary Judgment (regarding the 1987 Policy).

The Court has held a hearing and had the benefit of the arguments of counsel.

## I. INTRODUCTION

Without directing criticism to any particular lawyer(s), it is fair to say that some of the presentations regarding these motions were disappointing. Because the RTC and American Casualty have litigated similar—but not identical—issues in many other cases, the matter was grossly over-briefed.[2] Moreover, some of the arguments presented appear to have been made because they are found on some checklist of all possible arguments, rather than through informed professional judgment regarding this particular case.

It is appropriate for the Court to suggest to certain of the counsel in this case—and if you do not know who you are, an adverse party will tell you—that it would be best to pay more attention to the evidence and precedents as they exist rather than as you wish they were.

The following discussion of the facts underlying the present dispute and the legal authority guiding the Court's decision is not a sweeping exploration of savings and loan crisis litigation. Rather it is—or better put, is

## MEMORANDUM AND ORDER

GARBIS, District Judge.

The Court has before it the following motions and the materials submitted by the parties[1] relating thereto:

1. In some instances, individual defendants have filed motions and memoranda essentially identical to those of the RTC. For purposes of this Memorandum and Order, all defendants will be deemed to be included in the Court's discussion of the RTC's position.

2. The discussion of unreported decisions was carried to an extreme in this case.

intended to be—a focused analysis of the distinct issues brought before this Court. For the reasons set forth herein the Court concludes that there is no genuine issue of material fact and that American Casualty is entitled to summary judgment.

## II. *BACKGROUND*

Baltimore Federal Financial, F.S.A. ("Baltimore Federal"), purchased two directors' and officers' insurance policies from American Casualty Company of Reading, Pa. ("American Casualty"). The first policy, in effect from June 14, 1984, to May 1, 1987 (the "1984 Policy"), provided broad coverage and contained a one-year discovery period option. The second, for the period from May 1, 1987, to May 1, 1988 (the "1987 Policy"), provided considerably narrower coverage, had higher deductibles, and included only a ninety-day discovery period option.

The reduced coverage of the 1987 Policy was due to a combination of the general effects of the savings and loan crisis on the insurance industry and specific risks regarding Baltimore Federal that came to American Casualty's attention. Specifically, on July 2, 1986, Baltimore Federal entered into an agreement with the Federal Home Loan Bank Board ("FHLBB") requiring Baltimore Federal to bring into compliance with federal standards its record-keeping, accounting, lending, and appraisal practices (the "Supervisory Agreement"). American Casualty's reaction to the FHLBB's criticisms is reflected in, among other things, the regulatory exclusion included in the 1987 Policy.

In 1989, the FHLBB determined that Baltimore Federal was insolvent and appointed a conservator. The Resolution Trust Corporation ("RTC") was named the receiver, and in February 1992, it brought suit against Baltimore Federal's directors and officers based on their "unsafe, unsound and reckless lending policies and practices during the years 1983 to 1985." (*See RTC v. Hecht, et al.*, Civil Action No. MJG–92–371, Compl. at ¶ 1.) The present dispute—between American Casualty, on the one hand, and the RTC and the directors and officers of Baltimore Federal, on the other—is related to the *Hecht* case. In the instant case, American Casualty seeks a declaratory judgment that it is not responsible for covering any of the losses claimed in the underlying suit.

## III. *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted only if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Addressing the analysis a trial court should use in considering a motion for summary judgment, the Supreme Court has explained:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Fourth Circuit has reiterated that "[f]ailure of proof of an essential element of the case 'necessarily renders all other facts immaterial.'" *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553).

On a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59 (1970). Thus, the Court must view the evidence in the light most favorable to the nonmoving party.

Rule 56, however, does not relieve the nonmovant of all responsibility to rebut the motion. In an ordinary civil case, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. As Judge Winter said in *Bland v.*

*Norfolk and Southern Railroad Company,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.,* any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

*See also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (noting "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial") (quoting *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553).

## IV. DISCUSSION

### A. Notice under the 1984 Policy

■ The RTC claims that Baltimore Federal provided notice of potential claims to American Casualty in 1987 through the information it provided in its applications to renew the directors' and officers' liability policies, thereby complying with Paragraph 6(A) of the 1984 Policy[3] and justifying coverage under that notice clause. In particular, the RTC claims that American Casualty's awareness of "all of the troublesome events that had culminated in the Supervisory Agreement" constituted notice of potential claims.

■ Under Maryland law, "[w]here the facts are undisputed and only one conclusion is reasonably possible, the question whether or not the insured under a liability policy complied with the requirement of notice is a question of law for the court...." *Lennon v. American Farmers Mutual Ins. Co.,* 208 Md. 424, 118 A.2d 500, 503 (1955). Thus, when there is no dispute as to the specific facts necessary to determine whether notice was given, summary judgment is appropriate.

The facts regarding the substance of the purported notice and the way it was sent to American Casualty are undisputed. First, Baltimore Federal never sent a letter expressly notifying American Casualty of potential claims in 1987, and no transmissions of any kind relevant to the future *Hecht* suit were sent to the Claims Manager, as required under Paragraph 6(c), until 1988. Second, the Supervisory Agreement, containing the substance of Baltimore Federal's alleged notice, was entered into with the promise of "FHLBB's forbearance from the initiation of formal enforcement proceedings"; in other words, in exchange for the FHLBB's promise not to bring any claims. (*See* Def.'s Mem. at 6.) Third, in response to a question on American Casualty's renewal application about cease-and-desist orders and special agreements, Baltimore Federal stated, "As a result of the FHLBB examination, on 7/2/86 entered into Special Agreement with FHLBB. *Terms are being complied with.*" (Application Questionnaire, (emphasis added).) Fourth, also in the renewal application, Baltimore Federal responded "No" to the question, "Does any Director or Officer of the Association or any of its Subsidiaries have knowledge or information of any act, error or omission which might give rise to a

---

3. The relation-back notice provision of the 1984 Policy, found in Paragraph 6, provides as follows:

> If during the policy period the Association or the Directors or Officers shall: (i) receive written or oral notice from any party that it is the intention of such party to hold the Directors or Officers, or any of them, responsible for a Wrongful Act; or (ii) become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and Officers, or any of them, for a Wrongful Act; and shall, during such period, give written notice thereof to the Insurer as soon as practicable and prior to the date of termination of the policy, then any claim which may subsequently be made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of this policy be treated as a claim made during the policy year in which such notice was given.

1984 Policy ¶ 6(a). The provision further required that notice be sent to "Manager, Professional Liability Claims, CNA Insurance, Chicago, Illinois 60685." *Id.* ¶ 6(c).

claim under the proposed policy?" Fifth, the Home Shopping Network prospectus sent by Baltimore Federal to American Casualty, which supposedly disclosed potential claims, also contained the following disclaimer: "*Management believes that it has promptly complied in all material respects with its obligations under the supervisory agreement.*" And, finally, addressing the Supervisory Agreement that it now says · provided notice of potential claims, Baltimore Federal asserted in April 1987:

> It is our contention that *we are now in compliance with all of the shortcomings listing in the agreement.* An examination is currently being conducted by the Federal Examiners; and, upon its conclusion, *we expect that the agreement will be nullified.*

(Letter from Baltimore Federal to Charter Corporation, dated April 29, 1987 (emphasis added).) Taking all this undisputed evidence and viewing it in the light most favorable to the RTC, the Court cannot conclude that a reasonable juror could find that, by its affirmative actions, Baltimore Federal provided proper notice of potential claims to American Casualty.

The question then becomes whether raw data embodied in the Supervisory Agreement and otherwise given to the insurer, itself, can be said to have provided notice—actual, constructive, or inquiry—at the same time Baltimore Federal was reassuring American Casualty that no claims were to be filed against it. The only logical answer must be "No", the Court cannot find notice in such a mixed message. *See American Casualty Co. of Reading, Pa. v. FDIC,* 944 F.2d 455, 460 (8th Cir.1991) ("*Farmers*") (holding that applica-

tion information was not effective notice of potential claims); *California Union Ins. Co. v. American Diversified Sav. Bank,* 914 F.2d 1271, 1277–78 (9th Cir.1990), *cert. denied sub nom. Sahni v. Harbor Ins. Co.,* 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991); *American Casualty Co. of Reading, Pa. v. Continisio,* 819 F.Supp. 385, 396–97 (D.N.J. 1993) ("While the information supplied by the bank during the renewal process may well have provided 'notice' in the sense of 'knowledge,' we read the provision as requiring some affirmative act on the part of the insured *intending* to provide written notice of the negligent acts and of their awareness of them."), *aff'd,* 17 F.3d 62 (3rd Cir.1994). It must be emphasized, this is not a finding of degree, but rather one of kind. American Casualty received *no notice, not insufficient notice* (wherein the question of sufficiency might otherwise present an issue of fact precluding summary judgment).[4]

The RTC further argues that the changed provisions of the 1987 Policy evidence American Casualty's notice of potential claims, alleging that the Plaintiff is trying to "perpetuate a 'heads we win, tails you lose' whipsaw." Aside from the fact that Baltimore Federal seemingly did everything within its power to persuade American Casualty that the Supervisory Agreement was being complied with and that no claims would result from it, this misstates the difference between the specific notice required under Paragraph 6 and appropriate bargaining among sophisticated parties for a new contract. As the Eighth Circuit noted in a similar context:

> It is true that American Casualty increased its premium and decreased its cov-

---

4. For this reason, the *Heidrick* decision relied upon by RTC is not on point. *FSLIC v. Heidrick,* 774 F.Supp. 352 ("*Heidrick I* "), *on reconsideration, rev'd on other grounds,* 812 F.Supp. 586 (D.Md.1991), *aff'd sub nom. F.D.I.C. v. American Casualty Co. of Reading, Pa.,* 995 F.2d 471 (4th Cir.1993) ("*Heidrick III* "). In *Heidrick I,* it was undisputed that while the policy was in effect the bank's conservator sent a letter to its insurance company, containing the following:

> As Conservator and on behalf of the Association ..., *I hereby am giving you written notice, pursuant to Section 6 of the policy, that I am aware of occurrences which may subsequently give rise to claims* being made against the

Directors and Officers of the Association as defined in Section 1(A) of the above mentioned policy, for one or more wrongful acts as defined in Section 1, Paragraph (E) of the policy. *Id.* at 354 (emphasis added). The insurance company claimed that the letter failed to provide sufficient details to constitute notice of a potential claim. Judge Murray found summary judgment to be inappropriate when the dispute between the parties revolved around the *adequacy* of notice provided. *Id.* at 359.

As stated above, the Court finds the present dispute to be over whether *any* notice was provided, not whether the notice provided was sufficient.

erage for the officers and directors when it discovered the state of the Bank's loan portfolio. *That strikes us, however, as a reasonable business decision rather than bad faith.* The parties are sophisticated business people who dealt at arm's length. *Farmers,* 944 F.2d at 459 (emphasis added).

Moreover, and finally, it is undisputed that Baltimore Federal knew how to file a claim under Paragraph 6. On April 26, 1988, by letter, Baltimore Federal sent notice of potential claims under the 1987 Policy to the claims manager, as required. In proper form—unlike anything alleged to be notice under the 1984 Policy—the letter states, "[W]e hereby notify you that pursuant to Section 6 of the Policy claims may be made against the insureds in respect to one or more of the transactions set forth in the following Exhibits." This proper notice further supports the Court's finding that no notice was given under the 1984 Policy. *See Pacific Indem. Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 488 A.2d 486, 489 (1985) (noting that, in Maryland, "[c]ourts may construe ambiguous contracts as a matter of law" and that "extrinsic evidence may be consulted to determine the intention of the parties and whether the ambiguous language has a trade usage").

### B. *Notice of Nonrenewal*

■ The RTC also claims that American Casualty failed to give a required forty-five days' notice of nonrenewal to Baltimore Federal at the expiration of the 1984 Policy and, consequently, any losses from the *Hecht* suit should be covered under that policy. *See* Md.Ann.Code art. 48A, § 240A(a)(3) (Supp. 1993). This assertion fails for both of two reasons. First, based on Maryland law and undisputed facts, the Court finds that the 1987 Policy was a renewal, precluding any notice requirement. And second, if the Court were to assume that the policy was a nonrenewal, there still would be no remedy

under the facts presented, even viewing them in a light most favorable to the RTC (is the opposite of how they should be viewed).

■ Maryland recognizes that an insurance policy may be deemed a renewal even if the terms of a predecessor policy are changed. *See World Ins. Co. v. Perry,* 210 Md. 449, 124 A.2d 259, 262 (1956) ("[P]arties may renew a policy on terms different from those contained in the original contract...."); *J.A.M. Assocs. of Baltimore v. Western World Ins. Co.,* 95 Md.App. 695, 622 A.2d 818, 819 (1993) (finding a policy that excluded "all losses arising out of lead paint poisoning" to be a renewal nonetheless); CO-MAR 09.30.32.01 ("Often when a property and casualty policy is renewed, coverage is reduced or eliminated or deductibles are increased."). When terms are changed, all that is required is proper notice of the new terms.[5] *See J.A.M. Assocs.,* 622 A.2d at 822 ("[A]s a matter of fairness and of assuring mutual assent to what is, in reality, a new contract, the law requires that reasonable notice be given to the insured if the insurer intends to make a significant change in the new policy."); COMAR 09.30.32.02(A) ("[T]he insurer shall give the insured, in general terms, written notice of the change in the policy."). Moreover, under Maryland regulations, formal written notice is not required for "commercial risks who use the services of a risk manager, broker, or insurance adviser." COMAR 09.30.32.02(C).[6]

The undisputed facts in the present case lead the Court to conclude that no reasonable juror could fail to find the 1987 Policy to be a renewal on different terms. There was no automatic-renewal provision in the 1984 Policy, as would be expected if the parties had intended the policy terms to continue un-

---

**5.** *Ropka,* so heavily relied upon by the RTC, merely reflects what happens when proper notice of changed terms is not provided to the insured. *GEICO v. Ropka,* 74 Md.App. 249, 536 A.2d 1214 *cert. denied,* 312 Md. 601, 541 A.2d 964 (1988). For that reason, and a wide variety of others, it is not helpful in the present context.

**6.** The RTC itself recognized that "[t]he statute applicable to casualty insurance policies requires notice of reductions in coverage only when those reductions amount to nonrenewal." (Def.'s Reply Mem. at 8.)

changed, nor was there a practice of unnegotiated, pro forma renewals between the parties. The 1987 Policy was labeled a "renewal," a characterization never disputed by Baltimore Federal during the negotiations for the new policy. (*See* Renewal Quotation, cover page.) Baltimore Federal was well aware of the changed terms, through both American Casualty's warnings and the bank's own sophisticated evaluation of the proposal. Baltimore Federal plainly had the benefit of "a risk manager, broker, or insurance advisor." In fact, to help evaluate its options in 1987, Baltimore Federal had before it a sixty-eight page report from its broker, Charter Corporation, a forty-five page report from an independent insurance consulting firm, the Wyatt Company, and its own fifty-eight page internal report. All noted the changes in the 1987 Policy. The minutes of Baltimore Federal's annual meeting, held on April 29, 1987, reveal that the meeting itself had been expedited to address the "substantial changes in coverage for both the directors and officers liability policy and the blanket bond" and that the bank's own internal insurance committee had "reviewed the specific exclusion contained in the directors and officers liability coverage."

Finally, it is clear to the Court that the 1987 Policy, willingly (if not happily) purchased by Baltimore Federal, did provide some measure of coverage—albeit, limited—to make it more than a mere mirage. In all likelihood, the 1987 Policy contained the best terms Baltimore Federal could secure at that time. There is evidence before the Court showing that Baltimore Federal tried but failed to obtain policy quotations from several other insurers. To quote the Eighth Circuit, "We have no reason to suppose that a better deal could have been gotten for the bank from any other insurer." *Farmers*, 944 F.2d at 460. As that court aptly noted,

"[T]he difference between a significant exclusion and an insignificant exclusion is the happenstance of later events." *Id.* at 458. Where, from the undisputed evidence, it can be shown that the parties agreed to a renewal on changed terms, it is not for this Court, in hindsight, to reorganize their affairs. *See id.*; *Continisio*, 819 F.Supp. at 400 (reading the Eighth Circuit decision to say "when the insured *accepts* the new or different terms, . . there was not a failure to renew").[7]

Assuming, only for purposes of argument, that American Casualty failed to provide the required notice of nonrenewal, the RTC's motion still must fail because it is not entitled to any meaningful remedy. The evidence before the Court reveals that Baltimore Federal, under both the statutory and contractual schemes, failed to take actions in 1987 that might have justified a remedy.

Section 240D of Maryland's Insurance Code provides, *inter alia*, that when an insurer fails to provide the appropriate notice of nonrenewal:

> such insurer shall be liable to the applicant for the coverage which was requested, or which would have become effective except for the failure to comply with these sections, unless the person seeking coverage no longer wishes the coverage, has obtained other substantially equivalent coverage, or fails to tender or pay the premium after reasonable demand therefor has been made.

Md.Ann.Code art. 48A, § 240D (1991). Strictly following section 240D, the coverage "which would have become effective" in this case is the one-year discovery period embodied in Paragraph 2(b) of the 1984 Policy.

Adopting, by analogy, the standard of diligence required by section 240B of the Insurance Code, and measuring from the viewpoint of a reasonable fact-finder, the Court

---

7. The *McCuen* decision, so heavily relied upon by the RTC, is not persuasive in this case. *McCuen v. American Casualty Co. of Reading, Pa.*, 946 F.2d 1401 (8th Cir.1991). Unlike the present dispute, *McCuen* was based on the law of a state (Iowa) that required renewals to be on the same terms, *id.* at 1404, and on facts showing that the bank in that case never accepted the new terms. *Id.*

cannot find that Baltimore Federal "discover[ed] or should have discovered that [its] policy ha[d] not been renewed" any later than the date it entered into the 1987 Policy, May 1, 1987. *See* Md.Ann.Code art. 48A, § 240B (1991). On that date, Baltimore Federal had the most pointed notice possible that, in its words, the 1984 Policy was not to be renewed—the activated 1987 Policy—and, as the RTC argues, Baltimore Federal could have opted for coverage under the discovery period. To allow greater coverage would be to "allow the insured, in effect, to write the new policy, adding or increasing coverage, eliminating conditions and exclusions. We do not believe that the Legislature intended that result." *See Admiral Ins. Co. v. John Stromberg & Assocs.*, 77 Md.App. 726, 551 A.2d 923, 932, *cert. denied*, 315 Md. 691, 556 A.2d 673 (1989).

Unconvinced that section 240D appropriately addressed the remedy for a failure to give notice, the *Admiral Ins.* court looked to section 240B for further guidance, and found as follows:

> [Section 240A] simply requires advance notice of a decision to cancel or nonrenew. A complete remedy for noncompliance with *that* requirement is set forth in § 240B. If the insurer fails to give the notice required by § 240A, it is obliged to renew the policy. Subsection (a) of § 240B makes that clear by requiring the insurer to give notice of the renewal premium. If it fails to do that as well, § 240B(b) requires the insurer (1) to continue coverage for any claim which would have been covered under the policy if it arises within 45 days after the insured discovers that the policy was nonrenewed and (2) to actually renew the policy upon a timely tender of the premium. That is a clear, rational scheme which fully and fairly remedies the violation.

*Id.* at 931; *see* Md.Ann.Code art. 48A, § 240B (1991) (entitled "Notice of Renewal Premium Due").

■ The discovery clause contained in the 1984 Policy provides the following:

> If the Insurer shall cancel or refuse to renew this policy, the Association shall have the right, upon payment of seventy-five percent (75%) of the annual premium or twenty-five percent (25%) of the three year prepaid premium ..., to an *extension of the coverage granted by this policy with respect to any claim or claims which shall be made* against the Directors or Officers during the period of twelve calendar months after the date of such cancellation or refusal to renew, but only with respect to any Wrongful Act committed before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the appropriate premium, must be made within ten (10) days after the effective date of cancellation or non-renewal of the policy.

1984 Policy, ¶ 2(b) (emphasis added). If enforcement of the discovery period is the appropriate remedy, the RTC is left empty-handed because (1) Baltimore Federal neither gave written notice nor paid the required premium within ten days, and (2) the bank gave no notice of a claim, nor was any claim filed against it, during that period. The RTC argues, however, that the discovery clause should be read to cover notice of potential claims (which was provided by letter on April 26, 1988, albeit with reference to the 1987 Policy) under Paragraph 6(a) of the 1984 Policy. In Maryland, "when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 492 A.2d 1306, 1310 (1985).

The plain language of Paragraph 2(b)— "any claim or claims which shall be made"— precludes coverage based on mere notice of potential claims. This is confirmed by a careful reading of the unambiguous language in Paragraph 6(a), requiring that notice of

potential claims be given "during the policy period," and Paragraph 2(a), distinguishing between "the policy period" and "the discovery period." *See American Casualty Co. of Reading, Pa. v. FDIC*, 958 F.2d 324, 327–28 (10th Cir.1992) (*"Oklahoma Federal"*) ("[N]otice of an 'occurrence' triggers coverage only if that notice is given during the initial policy period prior to the commencement of the extended discovery period.").[8] To rule otherwise would be to convert what is admittedly a claims-made policy into an occurrence policy. This the Court will not do.

Likewise, if this Court were to follow the *Admiral Ins.* court's suggested remedy, the RTC remains without a right to recover from American Casualty. Here, it must be reiterated that the date that Baltimore Federal "discovers or should have discovered that his policy has not been renewed" in this case is the date that the 1987 Policy took effect. *See* 551 A.2d at 931; Md.Ann.Code art. 48A, § 240B(b)(1) & (b)(2) (1991). Using the dictates of section 240B, the Court finds from the undisputed evidence that no claims arose within forty-five days of the discovery date and that payment to renew the 1984 Policy (which is different from payment for the new 1987 Policy) was not tendered within thirty days of the discovery date. Consequently, section 240B would provide no remedy for the RTC.

## C. *The Regulatory Exclusion Clause*

American Casualty argues that the regulatory exclusion clause included as Endorsement No. 7 to the 1987 Policy (the "Regulatory Exclusion") prevents the RTC from asserting coverage for the claims forming the basis of the underlying *Hecht* case. The Regulatory Exclusion, identical to many others referenced in the growing case law surrounding the savings and loan crisis, provides as follows:

It is understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers based upon or attributable to: any action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation, the Federal Savings & Loan Insurance Corporation, any other depository insurance organization, the Comptroller of the Currency, the Federal Home Loan Bank Board, or any other national or state regulatory agency (all of said organizations and agencies hereinafter referred to as "Agencies"), including any type of legal action which such Agencies have the legal right to bring as receiver, conservator, liquidator or otherwise; whether such action or proceeding is brought in the name of such Agencies or by or on behalf of such Agencies in the name of any other entity or solely in the name of any Third Party.

(1987 Policy, Endorsement No. 7.) As is evident from its face, the Regulatory Exclusion is broad in scope and straightforward in focus. It must also be noted that this provision was part of an insurance contract agreed upon by sophisticated businessmen after arm's-length negotiations.

The RTC presents five reasons for avoidance of the exclusion: (1) the exclusion is ambiguous; (2) the exclusion is contrary to public policy; (3) the exclusion does not cover the RTC's actions because the RTC is not named in the exclusion and is not a regulatory agency; (4) the entire 1987 Policy is void because of inadequate notice of nonrenewal of the 1984 Policy; and (5) there has been inadequate discovery regarding American Casualty's motion.[9] None of these reasons

---

**8.** This Court does not agree with the contrary decision of *McCuen*, 946 F.2d at 1405–06. While the Tenth and Eighth Circuits appear to be diametrically opposed on this issue, this Court follows the Tenth Circuit because its focus—on the difference between the policy period and the discovery period—seems to be more sound than the Eighth Circuit's analysis of notice of potential claims as falling within the "any *claim or claims* which shall be *made*" language in Paragraph 2(b). 1984 Policy, ¶ 2(b) (emphasis added). Of

course, even if the Fourth Circuit were to agree with the Eighth Circuit, the result in this case would be unchanged. As was explained above, any notice of potential claims made by Baltimore Federal during the so-called discovery period was made under the 1987 Policy.

**9.** In a supplemental memorandum, the RTC raises an additional argument; namely, that the 1987 Policy was void for lack of consideration. Because it is undisputed that the 1984 Policy

presented in this context prevent summary judgment, especially considering the clear and compelling authority that has developed on this very issue. They will be addressed in turn.

■ First, as a matter of law, the Regulatory Exclusion is neither ambiguous nor contrary to public policy. At the hearing held on this Motion, Defendants as much as conceded so, and this Court is bound by mandatory authority on these points. *Heidrick III*, 995 F.2d at 472–73 (finding that an essentially identical regulatory exclusion clause was neither ambiguous nor in violation of public policy); *Finci v. American Casualty Co. of Reading, Pa.*, 323 Md. 358, 593 A.2d 1069, 1074–80 (1991).

The Court's finding that the Regulatory Exclusion is not ambiguous extends to refute the RTC's argument that it is unclear whether the exclusion covers the RTC as a regulatory agency. Created after the exclusion was drafted, the RTC was not mentioned in the provision. However, the fundamental reasons for the RTC's creation reveal that it is essentially the alter ego, reincarnation, or affiliate of the FDIC or FSLIC, organizations specifically addressed by the exclusion. *See American Casualty Co. of Reading, Pa. v. Baker*, 758 F.Supp. 1340, 1346 (C.D.Cal. 1991) (noting, *inter alia*, that "[t]he RTC replaced FSLIC as conservator or receiver of failed thrifts" and that the FDIC "now is the exclusive manager of the RTC"). All existing case law agrees that RTC is an agency for purposes of the Regulatory Exclusion. *See, e.g., id.* at 1348 [10]; *Chandler*, 833 F.Supp. at 737–38; *Finci*, 593 A.2d at 1075 (reading *Baker* to say that it was "natural and reasonable" to apply the exclusion to the RTC). This Court cannot find otherwise.

The RTC's contention that American Casualty failed to provide notice of nonrenewal—contained no automatic-renewal provision, this argument is wholly without merit.

The RTC relies on a single, unpublished decision from the Eastern District of Arkansas to support its contentions. Use of that decision is highly suspect because (a) it may be assumed that, written without an eye towards publication, the court did not intend its holding to apply beyond the facts of that case and (b) the case law it cites for support does not seem to apply in the present context. Moreover, a later decision from the same district, *Chandler v. American Casualty Co. of Reading, Pa.*, 833 F.Supp. 735 (E.D.Ark. 1993), with facts nearly identical to the pending dispute, found "that the consideration issue lacks merit." *Id.*, 833 F.Supp. at 738.

Furthermore, the RTC's argument fails under Maryland law. In *World Ins. Co.*, 210 Md. 449, 124 A.2d 259, the Court of Appeals explained that "a renewal of a policy by the payment of a new premium and the issuance of a receipt therefor, where there is no provision in the policy for its renewal, is a new contract." *Id.*, 124 A.2d at 262. Additionally, it cannot be disputed that Baltimore Federal was aware of the new terms in the 1987 Policy and that the policy was, in all ways, treated by both of these sophisticated parties as a separate agreement. *See J.A.M. Assocs.*, 95 Md.App. 695, 622 A.2d at 822 (requiring only that "reasonable notice be given to the insured if the insurer intends to make a significant change in the new policy").

The RTC's reliance on *Ropka*, 74 Md.App. 249, 536 A.2d 1214, is misplaced for at least three reasons. First, *Ropka* dealt with a consumer buyer of an ordinary automobile insurance policy, distinguishable from the sophisticated parties presently disputing a complex directors' and officers' liability policy. Second, that court found that the insurer had failed to give the insured notice of the changed terms in his policy. And third, the *Ropka* court treated the policy as if it contained an automatic-renewal provision, noting that it had been renewed annually over a period of more than ten years. *Id.*, 536 A.2d at 1222–24. As stated above, the Court is unable to find, either within the terms of the 1984 Policy or based on a single occasion of renewal, that Baltimore Federal had an automatic right to renew. For all these reasons, this argument fails.

**10.** The *Baker* court summed up this issue in an expansive conclusion,

> The language of the policies, the case law, the statutory framework—inconclusive because inconsistent—, and the logic of the arguments made by the insurance companies persuade the Court that the Regulatory Exclusion applies to the RTC/FDIC and therefore excludes from insurance coverage the officers and directors named in the underlying action.
> *Baker*, 758 F.Supp. at 1348.

and that the 1984 Policy terms should therefore remain in effect—was addressed above, *supra* Part IV.B., and will not be revisited here. In the present context, the outcome of this argument can be no different than the outcome under the argument addressing the 1984 Policy. The Court finds, as a matter of law, that the undisputed evidence regarding the negotiations and application in 1987 led to a renewed insurance contract under Maryland law.

Finally, in its opposition dated October 19, 1992, a full year ago, the RTC claimed that it had not had an opportunity to conduct sufficient discovery regarding the pending Motion and, therefore, summary judgment should be denied. *See* Fed.R.Civ.P. 56(f). Because the Court finds as a matter of law that the Regulatory Exclusion is valid as to the RTC, future discovery in this area would be irrelevant and impose needless expenses on all parties. The resolution of this Motion is not to be delayed by future fact-finding. *See Cohn v. Bond,* 953 F.2d 154, 159 (4th Cir. 1991) (leaving to the trial court's discretion "[t]he refusal to allow continued discovery where it was unnecessary"), *cert. denied,* — U.S. —, 112 S.Ct. 3057, 120 L.Ed.2d 922 (1992).

## V. *CONCLUSION*

For the foregoing reasons:

1. RTC's Motion for Partial Summary Judgment as to the 1984 Policy is **DENIED**.

2. American Casualty's Cross–Motion for Partial Summary Judgment Under the 1984 Policy is **GRANTED**.

3. RTC's Motion for Partial Summary Judgment Based on American Casualty's Failure to Send Notice of Nonrenewal is **DENIED**.

4. Defendant Robert E. Hecht Sr.'s Motion for Partial Summary Judgment Based on American Casualty's Failure to Send Notice of Nonrenewal is **DENIED**.

5. American Casualty's Motion for Partial Summary Judgment (regarding the 1987 Policy) is **GRANTED**.