United States Court of Appeals,

Fifth Circuit.

No. 94-30707.

FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellant, Cross-Appellee,

v.

Burnice E. BOOTH, et al., Defendants,

Burnice E. BOOTH, et al., Defendants, Cross Claimants, Plaintiffs-Appellants,

and

Burnice E. Booth, et al., Defendants, Cross Claimants, Plaintiffs-Appellants, Cross-Appellees,

v.

The ST. PAUL INSURANCE COMPANY, Defendant, Cross Defendant-Appellee, Cross Appellant.

May 14, 1996.

Appeals from the United States District Court for the Middle District of Louisiana.

Before DeMOSS and DENNIS, Circuit Judges, and DUPLANTIER, District Judge[*].

DUPLANTIER, District Judge:

The Federal Deposit Insurance Corporation ("The FDIC") and the directors of a failed bank appeal the district court's judgment dismissing their suit against St. Paul Insurance Co. The district court concluded that the defendant insurer's directors and officers liability insurance policy did not provide coverage for the activities of the directors for which the FDIC seeks recompense.

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

1

We find no error in the district court's ruling and AFFIRM.

A directors and officers liability insurance policy issued by St. Paul Insurance Co. to the Livingston Bank in Denham Springs, Louisiana, covered the liability of the bank as an entity and that of its directors and officers individually ("Directors"). The policy was effective from January 2, 1983, with an initial three year term ending January 2, 1986. St. Paul canceled coverage effective May 29, 1985.[1] Pursuant to a policy endorsement, the

---

[1]The Directors argue that St. Paul's effort to cancel the policy on May 29, 1985 was ineffective, and that the policy period therefore continued until January 2, 1986, with an extended one year discovery period from that date. We disagree.

The policy's cancellation provision reads as follows:

This policy may be canceled by the Company by mailing to the insured ... written notice stating when not less than thirty days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender, or the effective date and hour of cancellation, shall become the end of the policy period.

Both parties agree that St. Paul sent the Directors written notice by letter dated April 23, 1985, via certified mail, return receipt requested, stating that the policy would be canceled thirty days from the receipt of notice. The Directors acknowledge receipt of this letter, but argue that the cancellation was ineffective because the letter of cancellation did not name a specific date and/or hour of cancellation. They insist that because the printed language of an insurance policy is strictly construed against the insurer, St. Paul's cancellation notice was ineffective.

This argument is far-fetched. Although a specific date is not mentioned in the letter, the date of cancellation is easily determinable by adding thirty days to the date of the Directors' receipt of the letter. The certified mail return receipt allows both parties to document this initial receipt date. Although no "hour" of cancellation is noted, this cannot invalidate the entire cancellation attempt. As a result of St. Paul's failure to state the hour on which the cancellation would be effective, coverage continued through

2

Bank then exercised its right to purchase an extended twelve month discovery period providing coverage for acts or omissions prior to the date of termination discovered during the ensuing twelve months.

On March 13, 1994, the FDIC instituted this action against the Directors, charging that they breached their duties in the management of various loans made during the policy period. The FDIC additionally named St. Paul as a defendant under the Louisiana Direct Action Statute.[2] Because St. Paul denied coverage of the Directors' actions, a number of the Directors also filed a cross-claim against St. Paul.

St. Paul moved for summary judgment on the ground that no event had occurred during the period in which the policy was in effect which would result in coverage under the terms of the policy. The district court initially denied this motion without assigning reasons.

Thereafter, the Directors moved for partial summary judgment, seeking a declaration that the policy required St. Paul to provide the Directors a defense. In response, the district court held that the policy did not impose a duty to defend, but that it did require a contemporaneous reimbursement of defense costs.[3] The district court certified that ruling for appeal, but this court denied jurisdiction.

midnight on the effective date of cancellation.

[2]La.Rev.Stat.Ann. 22:655.

[3]*FDIC v. Booth,* 824 F.Supp. 76 (M.D.La.1993).

3

St. Paul later reurged its motion for summary judgment on coverage, citing new precedent from this circuit. The district court reversed itself and granted St. Paul's motion. In its oral reasons, the district court additionally found that, should this court reverse the ruling on coverage, the policy would still require contemporaneous reimbursement of defense costs. The district court entered judgment dismissing all claims against St. Paul.

The FDIC and Directors appeal on the coverage issues, and St. Paul cross-appeals on the district court's order that it contemporaneously reimburse defense costs in the event that we conclude that there is coverage. Because we find that the district court correctly determined that the policy does not cover the Directors' activities, we do not address the issue of contemporaneous reimbursement of defense fees.

We review the district court's summary judgment decisions *de novo,* applying the same standards applicable to the district court.[4] We review the record independently and make any factual inferences in favor of the non-moving party.[5]

St. Paul's policy contains the following relevant provisions concerning coverage:

III. POLICY PERIOD: This Policy applies to any negligent act, any error, any omission, or any breach of duty which occurs:

(1) During the policy period and then only if *claim is made or suit is brought during the policy period.* If,

---

[4]*FDIC v. Myers,* 955 F.2d 348, 349 (5th Cir.1992).

[5]*Degan v. Ford Motor Co.,* 869 F.2d 889, 892 (5th Cir.1989).

4

during this policy period, the Insured shall have knowledge or become aware of any negligent act, any error, any omission or any breach of duty and shall, during the policy period, *give written notice thereof* to the company, then such notice shall be considered a claim hereunder;

* * * * * *

If the company shall cancel or refuse to renew this Policy, the Named Insured shall have the right upon payment of an additional premium of 10% of the three year premium hereunder, to ninety (90) days after the date of such termination in which to discover claims resulting from any negligent act, any error, any omission or any breach of duty alleged to have been committed prior to the date of termination....

ENDORSEMENT NO. 2
EXTENSION OF DISCOVERY PERIOD

It is hereby agreed that the discovery period of III POLICY PERIOD shall be amended to read:

"... If the company shall cancel or refuse to renew this policy the named insured shall have the right upon payment of an additional premium of 20% of the three year premium hereunder, to *twelve months* after the date of such termination in which to *discover claims* resulting from any negligent act, any error, any omission or any breach of duty alleged to have been committed prior to the date of termination. Such right hereunder must, however, be exercised by the named insured by written notice not later than ten (10) days after such termination date. If written notice is not given within the afore mentioned ten day period, the insured shall not at a later date be able to exercise such right." (Emphasis added.)

The Directors argue that under these provisions there are three distinct situations which result in coverage for events occurring during the policy period: 1) if a claim is made or a suit is brought during the policy period; 2) if, during the policy period, the insured has knowledge or becomes aware of any negligent act, error, omission, or breach of duty and, during the policy period, gives written notice thereof to St. Paul, or 3) if, during the one year "discovery period" after the cancellation of the

5

policy by St. Paul, the insured "discovers" claims resulting from any negligent act, error, omission, or breach of duty. The Directors contend that there is no "notice" requirement for this third situation; mere "discovery" by an insured during the twelve month extended period is sufficient for coverage.

In contrast, St. Paul contends that there is coverage in only two situations: 1) if a claim is made or suit is brought during the policy period; or 2) if during the policy period or (in the event of cancellation by St. Paul within twelve months after cancellation if the insured takes advantage of the extension of the discovery period) the insured gains knowledge, becomes aware of, or "discovers" an activity committed prior to the date of termination with claim potential and provides the company with written notice thereof during the policy period or the twelve month extended "discovery period." According to St. Paul, Endorsement No. 2 "Extension of Discovery Period" simply extends the period of time in which one of these two situations must occur for coverage to attach. We agree with St. Paul.

Under Louisiana law, an insurance contract must be interpreted as a whole.[6] The Directors' argument focuses only on specific provisions of the policy. They argue that because of the absence of a specific requirement of notice in the extended discovery period endorsement, no notice is required if the discovery occurs after termination. The Directors contend that in this respect the

_____

[6]*Scarborough v. Travelers Ins. Co.,* 718 F.2d 702, 708 (5th Cir.1983).

6

policy is ambiguous and must be interpreted in their favor.[7]

The Directors' argument ignores the fact that the "extension of discovery period" endorsement accomplishes nothing more than what it states: an extension of the discovery period. The endorsement merely amends a similar ninety day discovery period which is part of "Policy Period" in the body of the policy, in section III, which includes the notice requirement. The provision allowing the insureds to "discover" claims is part of the same section which provides that mere awareness by an insured of a negligent act is not considered a "claim" such as to trigger coverage unless the insured provides St. Paul with written notice within the policy (or the extended discovery) period. Interpreting the policy as suggested by the Directors entirely negates this provision.

The Directors also argue that because the provisions in Section III(1) of the policy begin with the words "during the policy period," those provisions do not apply to the extended "discovery" period. This reading of the contract does not make sense considering the policy as a whole. The only sensible reading of Section III leads to the conclusion that the extended discovery period in Endorsement No. 2 merely extends the "knowledge" or "aware" coverage period during which notice must be given to the company by twelve months after cancellation by the company. The Directors' interpretation would result in the policy providing

_____

[7]*Williams v. Galliano,* 601 So.2d 769 (La.App. 1st Cir.1992).

7

coverage after a notice of cancellation under circumstances which would not be covered had they occurred prior thereto. Nothing in the policy suggests such a strange policy construction. In effect, the Directors' interpretation would provide an extra benefit to an insured whose policy has been canceled, a benefit unavailable to an insured who is still covered during the regular policy period. Such a result is untenable.

We conclude that this policy provides coverage for any negligent act, error, omission or breach of duty which occurs during the policy period, but only if a claim is made or suit is brought during the policy period. In addition to the ordinary meaning of "claim", the policy provides that notice by the insured to the company of such activity is considered to be a claim if such notice is given before the end of the policy period or extended "discovery period" (in the event of cancellation).

There is no dispute that certain activity of the Directors of which the FDIC complains occurred during the policy period, nor that suit was not brought during the policy period. The only question is whether a "claim" was made within 12 months after the termination of the policy on May 29, 1985 (the last day of the extended discovery period). In order to resolve this issue, we must first determine what was contemplated by the use of the term "claim" in the D & O policy. Unfortunately, the policy itself does not define the term.

Although this court has not yet addressed a case with a policy identical to the one at hand, it has addressed cases

8

involving similar policies. In *FDIC v. Barham,*[8] and *FDIC v. Mijalis,*[9] this court determined that when the terms "claim" and "loss," are intimately connected in a policy, then a "claim" is a "demand which if sustained necessarily results in a loss."[10] The present policy meets this description.[11] Thus, we will apply *Barham-Mijalis* definition of "claim" to the present case.

Considering the undisputed facts, we conclude that no "claim" was made under the policy during the period of coverage. It is undisputed that no claim was made prior to the cancellation of the policy period. During the extended "discovery period," however, the FDIC sent the following correspondence to the Directors: 1) a March 27, 1986 letter that summarizes and encloses a 1985 FDIC Report of Examination of the Bank; and 2) a March 27, 1986 letter reminding the Directors of their obligations and warning them that "failure to take corrective action ... could result in civil money

---

[8]995 F.2d 600 (5th Cir.1993).

[9]15 F.3d 1314 (5th Cir.1994).

[10]*Id.* at 1332; *Barham,* 995 F.2d at 604.

[11]The policy provides that St. Paul will pay on behalf of the Directors "any claim(s) made against them," for "loss," caused by "any negligent act, any error, any omission, or any breach of duty while acting in their capacities as Directors and Officers...." Thus, the terms "loss" and "claim" are connected in the basic insuring agreement.

Furthermore, "loss" is defined as "any amount the Insured is *obligated to pay as respects his legal liability,* whether actual or asserted, for any negligent act...." We note that this definition of "loss" is remarkably similar to the definition of "loss" in the *Barham* policy, i.e., the "total amount which any insured person becomes legally obligated to pay."

penalties[12] being recommended and/or more severe enforcement actions being recommended to the FDIC Board of Directors." The FDIC and Directors assert that this language regarding a "more severe enforcement action," threatens personal liability against the Directors, and that this threat satisfies the *Barham-Mijalis* definition of the term "claim."

This court has not previously determined whether the mere "threat" of liability is sufficient to qualify as a "claim." In *FDIC v. Barham,* the only documentation received by the insurer was a 1982 letter of agreement between the bank and regulators, in which the bank agreed to "adopt and implement policies and procedures to prevent future violations of the law and regulation."[13] The document made no reference to the directors' personal liability for bad loans.[14] In that case the court held that a "mere demand for regulatory compliance does not rise to the level of a claim." It reasoned, "[b]ecause the 1982 letter makes no reference to a loss which [the bank] may sustain as a result of its failure to comply with certain banking regulations, we conclude that no claim was reported."[15]

Similarly, in *FDIC v. Mijalis,* the alleged "claims," with one exception, consisted of various demands by the regulators for

---

[12]Such civil money penalties are not covered by this policy. *See,* Insuring Agreement at 3.

[13]995 F.2d at 604.

[14]*Id.*

[15]*Id.* at 605.

corrective action by the Bank. The court reiterated that such demands will not be considered a claim if they "make no reference to a loss which [the bank] may sustain as a result of failure to comply with the demands."[16] The one exception in the *Mijalis* case was a statement by the FDIC that it was "considering recommending civil money penalties."[17] The court did not ultimately decide if this threat qualified as a "claim," because the policy in that case, as is true of the policy in the instant case, did not provide coverage for civil money penalties.[18] Nonetheless, in dicta, the court stated,

> In a broad sense, certainly, a threat to recommend civil money penalties would appear to come within the definition of "claim" we settled on in *Barham*. By warning that such penalties would be recommended if the Bank's regulatory violations were not corrected, the letter arguably makes a "demand which necessarily results in a loss—i.e., a legal obligation to pay—on behalf of the directors."[19]

The FDIC and the Directors argue that the FDIC's communications satisfy the standards suggested by *Barham* and *Mijalis.* The FDIC warned that the Directors could "be held liable for losses caused by [their] failure to properly supervise the affairs of the bank."[20] The agency also threatened to take other legal action, including seeking civil money penalties "and/or more

---

[16]15 F.3d at 1332.

[17]*Id.* at 1333.

[18]*Id.*

[19]*Id.*

[20]Record Excerpts, Tab "J".

11

severe enforcement actions."[21]  Finally, the FDIC suggested that the Directors consult with their attorneys, who could more fully explain the "potential liability."[22]

In spite of the *Mijalis* dicta, we do not consider the FDIC correspondence to the Directors to be a "demand that *necessarily* results in a loss."  The language of the letter indicates that even the FDIC considered the correspondence only a warning of "potential liability," making it more akin to a potential claim than a true claim.  Equating the mere threat of a claim with an actual claim negates the "necessarily" element in the very definition of "claim."  Such an interpretation would contradict the intentions of the insurance contract.

In making this ruling, we join the Sixth and Ninth Circuits in their interpretations of similar D & O policies.  In *MGIC Indemnity Corp. v. Home State Savings Assn.,*[23] cited approvingly by this court in *Barham* and *Mijalis,* the Sixth Circuit determined that a letter targeting directors as the subject of a grand jury indictment did not qualify as a "claim."  It reasoned that "a claim that a wrongful act has occurred is not the same thing as a claim for payment on account of a wrongful act," and that the "mere potential for such a claim is not enough to meet the condition imposed by the policy."[24]

---

[21]*Id.*

[22]*Id.*

[23]797 F.2d 285 (6th Cir.1986).

[24]*Id.* at 288.

Similarly, the Ninth Circuit has determined that threats of potential liability do not rise to the level of a demand for a particularized loss. In *Winkler v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,*[25] the court determined that a letter announcing that legal action would be instituted in the future to recoup losses, coupled with a meeting to discuss problems, did not constitute a "claim."[26] Although that decision was based on the particular policy language, the court emphasized in a footnote that they would reach the same conclusion even without the specific policy provisions. It reasoned, "to constitute a claim, a demand for something due or believed to be due must be made."[27] Likewise, in *California Union Ins. Co. v. American Diversified Savings Bank,*[28] also cited approvingly by this court in *Barham* and *Mijalis,* the Ninth Circuit again emphasized that a "claim" is a demand for a loss *immediately* due.[29]

The reasoning of these circuits appears more in line with the definition of a "claim" as a "demand that *necessarily* results in a loss." The mere "threat" of liability will not necessarily develop into an actual demand for compensation. Thus a letter suggesting that, in the future, charges may be filed against the Directors, if they do not comply with regulations, is too tenuous to constitute

[25] 930 F.2d 1364 (9th Cir.1991).

[26] *Id.*

[27] *Id.* at 1367, n. 4.

[28] 914 F.2d 1271 (9th Cir.1990).

[29] *Id.* at 1277.

13

a claim. We conclude that the FDIC correspondence does not rise to the level of a claim against the Directors.

Alternatively, the Directors and the FDIC contend that St. Paul "received written notice" of a potential claim arising out of the Directors' negligent acts, because St. Paul required the Bank to provide general financial and regulatory material during the time of coverage. They argue that the notice provision of the policy does not specify the manner of providing notice, and that the documents provided to St. Paul documented the Directors' negligent acts sufficiently to qualify as "such notice".

In response, St. Paul contends that the notice provision requires the Directors to provide notice in a separate and distinct act based on their awareness of a potential claim; as provided in the policy, the insured must "give written notice" that the insured has "knowledge or [has] become aware of" activity such as a negligent act or breach of duty. At the time the Bank transmitted the documentation to St. Paul, the Bank affirmatively represented that it knew of no potential claims arising from the acts of its officers and directors. We agree with St. Paul's contention that such a transmittal of FDIC documents cannot constitute "such notice" as to "be considered a claim" under the "Policy Period" provision.

St. Paul points out that when the Bank submitted to it a financial statement, copies of FDIC regulatory examinations, and a response to an underwriting questionnaire, it do so as part of a 1984 request by the Bank for an increase in coverage. On the

14

related Increase Application, the Bank indicated the following:

> "Question 2:  Has there been during the last three years, or is there now pending, any claim against any person proposed for this insurance in their capacity as either director, officer or employee (past or present)?  ...

> "Answer:  No.

> "Question 3:  Does any director or officer have knowledge or information of any act, error or omission which might give rise to a claim under the proposed policy?  ...

> "Answer:  No.

Similarly, in 1985, a Bank officer wrote to St. Paul transmitting a copy of a loan watch list and a 1984 Report of Examination from the Louisiana Commissioner of Financial Institutions.  Although the report does list as an "asset listed for special mention" one of the loans that later became the subject of this suit, it also states specifically that the borrower had sufficient income and net worth to support the credit.  The bank officer also attached a letter that stated he had "personally reviewed the Report of Examination and [found] that there [was] no information of a material nature that has not been previously reported to [St. Paul] that would have an adverse impact on our liability coverage."

This court has not addressed this coverage issue in a case with a notice requirement identical to that of the present policy. It has, however, addressed very similar provisions in other claims-made policies.  For example, in *Barham,* and in *RTC v. Ayo,*[30] the court examined policies that required notice of a "specified

---

[30] 31 F.3d 285 (5th Cir.1994).

15

wrongful act."[31]  And, in both *Mijalis,* and *McCullough v. Fidelity & Deposit Co. of Maryland,*[32] the court analyzed policies requiring written notice of "any such alleged wrongful act," referring to "specified wrongful act" in the previous paragraphs.[33]  In each case, the court determined that mere constructive notice of wrongful acts did not satisfy the policy's notice requirement.

The Directors and the FDIC attempt to distinguish these cases, because those notice provisions require notice of "specific" acts, whereas the present policy requires only written notice of any negligent act or breach of duty of which the insured has "knowledge" or is "aware."  This distinction is of no consequence; a provision requiring the insured's knowledge or awareness of the activity and "written notice thereof" clearly implies specificity in the notice.

A more pertinent distinction suggested by the Directors is that all of the above cited cases concern situations in which the insurer *inadvertently* obtained the documentation of the alleged claims.  In contrast, in the present case, St. Paul affirmatively *required* the Directors to supply the financial information.  We do not find this factual distinction significant enough to cause a different result, however.  In this case, the Directors gave specific assurances to St. Paul that the documentation they provided indicated no potential liability.  Delivery of documents

---

[31]*Id.* at 288;  *Barham,* 995 F.2d at 602.

[32]2 F.3d 110 (5th Cir.1993).

[33]*Id.;  Mijalis,* 15 F.3d at 1329.

16

accompanied by such statements cannot later serve the opposite function of providing notice of potential liability, regardless of which party initiated the delivery of information.

The FDIC suggests yet another approach, relying on Louisiana state law precedent that suggests a "liberal" position regarding the necessary "form" for policy notice requirements.[34] The FDIC argues that the documentation provided to St. Paul's in this case satisfies the purpose of the notice provision, which is to apprise the insurer of the facts underlying the insurer's potential liability, as required by the Louisiana courts; the Directors should not be penalized for mere "technical" noncompliance with the notice requirement.

The cases cited by the FDIC all address "occurrence" based policies, however, and not "claims-made" policies, as in the present case. In occurrence based policies, the notice requirement is generally included to aid *the insurer* in administration of its coverage of claims; in claims-made policies, the notice requirement actually serves to aid *the insured* by extending claims-made coverage beyond the policy period.[35] As such, we believe it should be strictly construed.[36]

Finally, we address the FDIC's contention that it should be

---

[34]*Deville v. Louisiana Farm Bureau Mutual Ins. Co.,* 378 So.2d 457 (La.App. 3d Cir.1979); *Paul v. Nat'l Amer. Ins. Co.,* 361 So.2d 1281 (La.App. 1st Cir.), *writ denied,* 363 So.2d 1385 (La.1978).

[35]*Barham,* 995 F.2d at 604, n 9, *citing FDIC v. Continental Casualty Co.,* 796 F.Supp. 1344, 1351 (D.Or.1991).

[36]*Id.*

17

allowed to recover as an injured third party under the Louisiana Direct Action Statute, even if the Directors failed to comply with the policy's notice requirements. The FDIC relies upon Louisiana state court cases to the effect that failure of an insured to give timely notice of a claim or of the filing of a suit is not a defense to a direct action suit by a third party against a liability insurer absent prejudice to the insurer from the lack of notice. See, e.g., *Williams v. Lemaire,* 655 So.2d 765 (La.App. 4th Cir.1995), *cert. denied,* 660 So.2d 481 (1995).

We need not decide whether the FDIC is a third party, as in those Louisiana cases, or instead an assignee or successor in interest to the Bank, the insured. This contention by the FDIC is based upon the premise, as stated in its brief, that "the FDIC made a claim during the policy period." We have already determined that no claim was made during the policy period. What is at issue here is not merely a policy provision requiring notice of a claim. St. Paul's policy provides coverage for designated activity during the policy period but only if a claim is made or suit is brought during the policy period. It is undisputed that no suit was brought during the policy period. Under the policy, absent suit the only way a claim is made is if the insured gives written notice "to the Company" of covered activity during the policy period.

To state it differently, this is not a situation in which a claim is made during the policy period and the insurer defends on lack of notice. Under the St. Paul policy, the written notice to the insurer constitutes the claim. There having been no written

18

notice, there was no claim during the (extended) policy period, and thus no coverage.

## CONCLUSION

For the reasons set forth above, we AFFIRM the district court's dismissal of the plaintiffs' claim against The St. Paul Insurance Company.