988 F.Supp. 1 (1997)
FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver for Madison National Bank, Washington, D.C., Plaintiff,
v.
Paul F. INTERDONATO, Defendant,
v.
VIRGINIA SURETY COMPANY, INC., Garnishee.
No. CIV. A. 95-2398 (RCL).
United States District Court, District of Columbia.
November 26, 1997.
*2 Thomas S. Richey, Hilary Harp, Mark S. Miller, Powell, Goldstein, Frazier & Murphy LLP, Atlanta, GA, Katherine H. Haygood, FDIC, Legal Div., Washington, DC, Allen T. Eaton, Jennifer E. Loud, Washington, DC, for Plaintiff.
Raymond J. Jast, Kristi A. Gleim, Wilson, Elser, Moskowitz, Edelman & Dicker, Chicago, IL, Janice Murphy, Wilson, Elser, Moskowitz, Edelman & Dicker, Washington, DC, for Defendant.

MEMORANDUM OPINION
LAMBERTH, District Judge.
This matter comes before the court on the plaintiff's application and motion for judgment of condemnation on writ of attachment and the garnishee's motion to quash and/or deny the writ of attachment on judgment.
Rule 69 of the Federal Rules of Civil Procedure authorizes proceedings in aid of judgment and execution "in accordance with the practice and procedure of the state in which the district court is held." D.C.Code § 16-556 and Superior Court Civil Rule 69-I(e) permit a "Judgment of Condemnation" enforcing a garnishment writ when supported by an "application" for judgment of condemnation. The default judgment in the present case is a proper subject for garnishment proceedings and insurance policy proceeds as an asset of defendant debtor Paul Interdonato may be reached with this writ of attachment. See Waters v. American Auto. Ins., 363 F.2d 684 (D.C.Cir.1966).
There is no claim that this case presents any disputed issues of material fact. For the reasons set forth below, the court grants the plaintiff's application and motion for judgment of condemnation on writ of attachment and denies the garnishee's motion to quash and/or deny judgment on the writ.

I. Background
As an initial matter, it should be stated that the parties to this suit entered into a *3 series of transactions and communications related to a bank insurance policy and improper loans by the bank that gave rise to the present suit by the plaintiff to obtain insurance policy proceeds from the garnishee.
The Virginia Surety Company ("VSC") issued a Directors and Officers Liability Including Company Reimbursement Policy No. 71106 ("D & O Policy") to James Madison Limited ("JML") for the policy period March 15, 1985 to March, 15, 1988. The policy was a "claims made" policy, providing coverage only for claims or potential claims sufficiently noticed within the policy period.[1] The D & O Policy was not a true claims made policy since it provided coverage for claims after the policy period arising out of "occurrences" sufficiently noticed during the policy period.[2] Section VII.A of the policy, titled Notice of Claims, provides:
A. If during the policy period or the extended discovery period:
1. The Company or the Directors or Officers shall receive written notice from any party that it is the intention of such party to hold the Directors and Officers or any of them, responsible for a Wrongful Act; or
2. The Company or the Directors or Officers shall become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and officers, or any of them, for a Wrongful Act; and shall in either case during such period give' written notice as soon as practicable to the Underwriters of the receipt of such written or oral notice under Clause 1 or of such occurrence under Clause 2, then any claim which subsequently is made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of this policy be treated as a claim made during the policy year in which such notice was given, or if given during the extended discovery period, as a claim made during the last policy year.
After the issuance of the D & O Policy, several transactions occurred that had important implications for the insurance coverage provided pursuant to the D & O Policy. On October 22, 1986, JML acquired United National Bank of Washington ("UNB") from United National Bank Bancshares. On or about July 17, 1987, auditors identified problems with the handling of installment loans referred to UNB by APA Leasing, Inc. ("APA"). APA is located in Northeast Washington D.C. and arranges for the sale of automobiles to customers, acting as middlemen between other automobile dealers and individual customers. On July 20, 1987, by Endorsement No. 10, the directors and officers of United National Bank of Washington ("UNB") were added to the D & O Policy for wrongful acts committed or alleged to have been committed after October 22, 1986. The policy provides $5,000,000 in coverage for its insureds.
On August 6, 1987, Norman F. Hecht, Sr., JML's Executive Vice-President, sent notice to VSC of "potential loss resulting from dishonest or fraudulent acts of an employee committed alone or in collusion with others." The letter also mentioned the possibility of officer and director liability. On August 19, 1987, Grace Leppin, a Senior Claims Attorney, responded by requesting additional information and writing that the "directors and officers liability policy could not be involved at present since no directors or officers of the bank have been sued." By letter dated October 13, 1987, Samuel L. Foggie, Sr., Chairman and CEO of UNB, provided Grace Leppin with a more detailed description of transactions relating to APA Leasing, Inc., a UNB customer, that may have resulted in wrongdoing. This letter described the investigation by JML's internal auditors into possible wrongdoing. On December 10, 1987, VSC's counsel replied to UNB's notice by *4 summarizing the "occurrences" described by UNB, noting the need for certain additional information, and deferring discussion of potential coverage relating to officers and directors until such time as a lawsuit might be filed. Subsequently, several letters were exchanged relating to possible coverage under the D & O Policy for the various complications that arose out of the APA situation.
Over the next four years, UNB's financial condition seriously deteriorated and UNB was ultimately merged into another of JML's subsidiaries, Madison National Bank, on March 29, 1991. As a result of the merger, Madison National Bank acquired all of UNB's assets. On May 10, 1991, the Office of the Comptroller of the Currency ("OCC") determined that Madison National Bank was insolvent, closed it, and appointed the Federal Deposit Insurance Corporation ("FDIC") as its receiver. On April 13, 1994, the FDIC notified UNB representatives of its intention to file an action against former UNB directors for losses originating out the APA Leasing loans. By letter dated May 3, 1994, lawyers for the former UNB directors notified VSC of this development. On December 29, 1995, the FDIC filed a complaint in this case against Mr. Interdonato, a former director of UNB. On December 4, 1996, this court made Findings of Fact and Conclusions of Law and entered Judgment by Default in favor of plaintiff FDIC against defendant Interdonato.
The present dispute concerns whether garnishee VSC is liable to plaintiff FDIC for the judgment the FDIC obtained against the defendant, Mr. Interdonato. The FDIC argues that VSC has wrongfully denied coverage under the D & O Policy and seeks to collect on its judgment against Interdonato by garnishing the D & O Policy. In response, garnishee VSC argues that it is not liable under the insurance policy for the following reasons: (1) UNB and its directors failed to sufficiently notify VSC within the policy period as required by the D & O Policy; (2) the asserted coverage relates to wrongful acts committed prior to October 22, 1986, that are not covered by the D & O Policy; (3) the release of VSC by UNB and its directors from "any and all claims in any way involving" the Spady and Cunningham lawsuits bars coverage for the FDIC's judgment against Interdonato, (4) the exclusion in the D & O Policy application form, Part C, Paragraph 3, for knowledge of a fact, circumstance or situation that ultimately might result in a claim bars coverage; (5) the prior acts exclusion bars coverage; and (6) VSC should not be bound by the default judgment entered against Interdonato. The FDIC denies the validity of the arguments presented by VSC in asserting the lack of coverage under the Policy. It argues that (1) UNB provided sufficient notice to VSC within the policy period; (2) VSC is estopped and has waived any argument regarding lack of notice; (3) the July 25, 1989 Release does not foreclose Mr. Interdonato's rights to coverage; (4) the exclusion in the application form for known claims as well as the prior acts exclusion do not bar coverage; and (5) VSC may not collaterally attack the default judgment.

II. Discussion

A. Notice
As an initial matter, the court must consider the parties' contentions regarding the proper interpretation of the D & O Policy. VSC contends that it is improper to consider parole evidence because the Policy is unambiguous. In particular, VSC urges the court not to consider the testimony of the FDIC's experts, Allan Windt and Grant Hubbard, concerning the meaning of this insurance policy. From the record, it appears that the FDIC does not contend that the Policy is ambiguous nor does it explain a sufficient basis for the consideration of parole evidence.
The parole evidence rule operates to bar the introduction of extrinsic evidence to vary the clear intent of an unambiguous insurance contract. See District-Realty Title Ins. Corp. v. Ensmann, 767 F.2d 1018, 1022 (D.C.Cir.1985) (citations omitted); Kessler v. Lincoln National Life Ins. Co., 620 F.Supp. 282, 284 (D.D.C.1985) (citing King v. Industrial Bank of Washington, 474 A.2d 151, 155 (D.C.App.1984)). Instead, the court should determine the intent of the parties from the language used in the insurance policy. See Travelers Indem. Co. v. Booker, *5 Civ. A. No. 84-0981, 1986 WL 15611, *2 (D.D.C. May 16, 1986). Courts should not seek out ambiguities when interpreting an insurance policy and the mere fact that the parties disagree about the meaning of the policy's language does not render the language ambiguous. See id. Since this court finds the D & O Policy unambiguous, the court declines to consider parole evidence in interpreting this D & O Policy.
Despite the court's conclusion that the text of the D & O Policy is unambiguous, the parties dispute how the court should apply its plain language, in particular the notice provisions. The notice provision of the policy has two prongs relating to notice. See D & O Policy Clause VII, Notice of Claims. The first prong covers situations in which the directors and officers receive written or oral notice that any party intends to hold the insured liable for a wrongful act. see id. The second prong, which is primarily relevant here, addresses situations in which:
[t]he Company or the Directors or officers shall become aware of any occurrence that may subsequently give rise to a claim against any of them for a Wrongful Act shall in either case give notice ... of the receipt of such notice under Clause 1 or of such occurrence under Clause 2....
See id.
VSC maintains that this court should apply the unambiguous language of the Policy by focusing on the words "Wrongful Act" instead of the word "occurrence." VSC points to the Eleventh Circuit's decision in RTC v. Artley, 24 F.3d 1363 (11th Cir.1994) for support. In Artley, the Eleventh Circuit had to interpret the notice provisions of a bank's directors and officers liability insurance policy that was similar to the D & O Policy's notice provisions.[3] The Eleventh Circuit concluded that notice of an "event or circumstance" under the policy also required notice of the related "wrongful act." Id. at 1367. Courts in the Fifth Circuit have also interpreted policy language similar to the Policy to require notice of particular "wrongful acts" giving rise to a subsequent claim. See FDIC v. Booth, 82 F.3d 670 (5th Cir.1996); RTC v. Ayo, 31 F.3d 285, 290-91 (5th Cir. 1994) (analyzing whether the insured provided sufficient "notice of a specified wrongful act that might give rise to a claim"); FDIC v. Mijalis, 15 F.3d 1314, 1329 (5th Cir.1994) (analyzing notice by determining whether the insureds objectively gave written notice of "specified wrongful acts"); McCullough v. Federal Deposit Insurance Co., 2 F.3d 110, 112 (5th Cir.1993) (finding that the policy language only made sense if it was read to require notice of "specified wrongful acts"); FDIC v. Caplan, 838 F.Supp. 1125, 1129 (W.D.La.1993) ("notice of actual or potential claims was a condition precedent to the insurer's obligations under the contract").
Courts focusing on a policy's "wrongful act" language have done so on two principal bases. First, courts have analyzed the language in insurance policies, finding that the policies' notice language incorporated by reference notice of particular "wrongful acts." See Booth, 82 F.3d at 678 (interpreting the policy's language that required the insured's knowledge or awareness of any negligent act or breach of duty and "written notice thereof" as clearly implying specificity in the notice); Artley, 24 F.3d at 1367 (finding that the policy's use of the words "such wrongful act" related the terms "wrongful act" and "event or circumstance," and indicated that they had the same meaning); McCullough, 2 F.3d at 112 (interpreting policy's use of the words "specified wrongful act"). Second, these courts have discussed the significant policy considerations underlying a "claims made" policy as compared to an "occurrence" policy. See McCullough, 2 F.3d at 112; Artley, 24 F.3d at 1368 ("Such a view, we believe would destroy the notification requirements at the heart of a claims made policy...."). *6 These decisions have found that "claims made" policies require notice to the insurer to trigger coverage whereas "occurrence" policies do not. See McCullough, 2 F.3d at 112; Artley, 24 F.3d at 1368. These courts have been concerned about liberal interpretations of these notice provisions allowing insureds to transform "claims made" policies into "occurrence" type policies after the fact and thereby eliminate the advantages of a "claims made" policy to both the insurer and in turn to future insureds. See id; Caplan, 838 F.Supp. at 1129-30.
Other cases interpreting similar insurance language discuss the sufficiency of notice by focusing on whether the insured has notified the insurer of an "occurrence." See LaForge v. American Cas. Co., 37 F.3d 580, 582-83 (10th Cir.1994) (determining the sufficiency of notice by analyzing whether the insured had provided written notice of an "occurrence"); FDIC v. Marsiglia, No. Civ. A. 90-4999, 1993 WL 114518, *3 (E.D.La.1993) (interpreting a notice provision in a similar bank insurance policy as requiring written notice of "occurrences" that might subsequently give rise to a claim against an officer or director of a bank); American Inst. of Architects v. Interstate Fire and Cas. Co., Civ. A. No. 89-2798, 1991 WL 186499, *2 (D.D.C. Sept.6, 1991) (Pratt, J.) (interpreting a "claims made' insurance policy to require notice of a `fact, circumstance or situation"); American Cas. Co. v. Wilkinson, No. CIV-89-1609-W, 1990 WL 302175, *2 (W.D.Okla. Dec. 21, 1990), aff'd sub nom., American Cas. Co. v. FDIC, 958 F.2d 324 (10th Cir.1992) (policy's language required notice of a claim made against the insured or of an "occurrence" that might subsequently give rise to a claim).
The court's review of the D & O Policy's language leads to the conclusion that it requires notice of an "occurrence." In contrast to the policy language in the "wrongful act" cases, Clause VII.A.2 of the D & O Policy does not contain a term like "such" to relate the terms "occurrence" and "wrongful act." Nor does it contain a three sub-part description of what constitutes sufficient "written notice" as in Artley. Instead the D & O Policy's clear language indicates that the insured must provide notice of an occurrence. A natural reading of the entire text of Clause VII indicates that the second prong of this notice clause refers to situations in which a party knows of an occurrence that might later give rise to a claim for a particular wrongful act. If the D & O Policy required notice of a wrongful act, then it would be more logical for Clause VII.A.2. to refer to awareness of any "wrongful act" and require notice of "such wrongful act under Clause 2" instead of "such occurrence under Clause 2." See D & O Policy, Section VII.A.2; see e.g., Continental Ins. Co. v. Metro-Goldwyn-Mayer, Inc., 107 F.3d 1344, 1346 (9th Cir.1997) (holding that notice of wrongful acts was required under a policy that provided coverage if the insured became aware of and gave proper notice of any wrongful act which might subsequently give rise to a claim).
Nevertheless, all of these cases indicate that an important factor in considering the sufficiency of an insureds' notice is its specificity. A mere recital of the policy's language does not suffice. The "wrongful act" cases reflect the importance of requiring the insured to provide the insurer with sufficient information before allowing coverage. Even the "occurrence" cases discuss the policy implications resulting from lax interpretations of notice provisions in a claims made policy. See LaForge, 37 F.3d at 583. These cases indicate that even when courts speak in terms of notice of an "occurrence," the notice must be put forth with some particularity. See id. at 584 (finding that the insurance policy unambiguously required "the insured to give notice of (1) an occurrence; (2) that might give rise to a claim against the officers or directors; for (3) a wrongful act, as defined in the policy"); American Inst. of Architects, 1991 WL 186499 at *2 (letter from Antitrust Division of the Department of Justice singling out specific records of insured was sufficiently particular); Wilkinson, 1990 WL 302175 at *4 (requiring more than general knowledge about problems in the savings and loan industry or "laundry list" of potential claims). These cases indicate that the crucial factor in these cases is not terminology but rather the specificity of the notice provided to the insurer.
*7 Accordingly, this court must apply the language of the D & O Policy to the facts of this case to determine whether UNB's notice to VSC was sufficiently particular. VSC contends that the notice provided under the policy was insufficient, barring coverage. It argues that the letters provided by UNB and its officers were insufficient notice of the Interdonato lawsuit. VSC argues that although it received valid notice of the Spady and Cunningham lawsuits, it did not receive notice, as required under the D & O Policy, of any potential claims against Interdonato until May 3, 1994. It asserts that any prior notice relating to possible director liability was not sufficiently particular to satisfy the D & O Policy's notice provisions with regard to Interdonato. It cites several federal opinions construing "claims made" policies and argues that these cases indicate that the notice provided in this case was insufficient. In response, the FDIC asserts that it has satisfied the notice provisions of the D & O Policy and that the cases cited by VSC are distinguishable from the present case.
Upon consideration of the parties' contentions on this issue and the court's own research, the court concludes that the notice provided to VSC satisfied the D & O Policy's requirements.
To trigger coverage under the D & O Policy, UNB had to provide notice to VSC during the policy period of an "occurrence" that might subsequently give rise to a claim. The policy period commenced on March 15, 1985 and concluded on March 15, 1988. During this policy period, UNB provided sufficiently particular information to VSC to satisfy the notice provisions of the policy under existing caselaw. UNB affirmatively undertook to notify VSC of a potential "occurrence" under the policy as opposed to merely expecting the insurer to discover from information UNB routinely submitted that an occurrence existed that might give rise to a claim. One of UNB's letter to VSC alerted VSC that it was intended by UNB to provide notice under the D & O policy. This "actual notice" by UNB is in sharp contrast to the constructive notice relied upon by the insureds in many of the cases cited by VSC. See infra, discussion of caselaw regarding notice. UNB's letters indicated that a loss had been suffered by UNB, identified that the APA loans might give rise to a claim, and described how the APA loans were made. The letters further indicated how and why violations of law might have occurred, notifying VSC of possible loan policy violations, unsafe lending practices, and fraud with regard to the APA loans. Samuel Foggie's October 13, 1987 letter described the following APA loan problems: (1) violations of UNB's loan policy, (2) inadequate financial support, (3) violation of sound credit principles, (4) loans made on false representations by APA, (5) disbursement of funds despite defects in title documentation and despite the failure of the customer to receive the automobiles, and (6) the misapplication of loans made to fund the resale of repossessed automobiles, with the effect that two loans were secured by the same automobile. UNB's letters also explained how and why these problems were discovered.
These letters were not a mere recital of policy language or a laundry list of possible errors by the bank. These letters targeted a particular situation or in the language of the policy, "occurrence," and indicated why these loans might give rise to claims. In two separate letters to VSC, UNB specifically mentioned the possibility of director liability, at one point identifying Interdonato as a director. Collectively, the letters sent by UNB to VSC during the policy period would have led a reasonable insurer to be aware of an "occurrence" that could give rise to a later claim under the policy for a wrongful act.
VSC urges the court to conclude that UNB'S letters "played down" the possibility of director liability by indicating that the board had taken action regarding the APA loan problem and alerting VSC to the Spady and Cunningham lawsuits. However, VSC's subjective interpretation of these documents cannot allow it to escape the validity of UNB's notice. Rather, UNB's effort to provide additional information to the insurer should be commended. The court's review of these letters does not reveal any statements by UNB that should have caused VSC to believe that there was no possible director liability related to the APA loan problem.
*8 Furthermore, notice of this type meets or exceeds the notice that other courts have found sufficient to satisfy similar notice provisions in insurance policies. In RTC v. American Casualty Co., 874 F.Supp. 961, 964-965 (E.D.Mo.1995), the court considered whether a bank's letter to the insurer, American, was sufficiently particular to satisfy the insurance policy's notice provisions. The court upheld the sufficiency of notice. Id. at 965-966. The bank's letter merely notified American of potential claims by the Federal Home Loan Bank Board ("FHLBB") against the bank directors as a result of deficiencies in documentation relating to certain real estate projects. See id. at 964. The letter did not specify the real estate projects at issue. See id. In fact, the letter appeared to discount the possibility of director liability, stating that the possibility of a claim was remote. See id. Here, UNB went beyond this level of specificity, describing the conditions leading to possible claims and identifying by name the particular loans in question.
In FDIC v. Marsiglia, 1993 WL 114518, *3 (E.D.La. April 7, 1993), the court also considered the sufficiency of a bank's notice to an insurance company. The bank provided the insurer, American, with fact specific information concerning the nature of Marsiglia's alleged misdeeds while CEO and President of First Financial. See id. at *3. The court found that this information sufficiently apprised American of the nature of Marsiglia's actions that eventually led to the lawsuit for which coverage was sought. See id.
In Continental Insurance Co. v. Metro-Goldwyn-Mayer, Inc., 107 F.3d 1344, 1347-48 (9th Cir.1997), the court considered the effect of information provided to the insurer under a policy that required notice of "wrongful acts" and specified a three part test concerning the adequacy of notice. The court specifically inquired into whether the notice was sufficiently particular. Id. at 1348. Metro-Goldwyn-Mayer ("MGM") had sent the insurer, Continental, a list of pending or potential litigation relating to a merger so as to put Continental on notice. Id. MGM sent Continental a copy of a complaint related to the merger and included a "laundry list" of potential claims. Id. The court held that this notice was sufficient. Id. Although the court found that MGM did not notify Continental of the specific claim for which coverage was now sought, it nevertheless held that notice of related suits and explicit notice that claims related to the merger might be forthcoming against the directors and officers sufficed. See id. Significantly, MGM's notice, like UNB's notice here, did not identify the possibility of the particular future lawsuit that resulted in a demand for coverage. It is also noteworthy that the text of MGM's policy appeared to hold it to a higher standard of notification that the D & O Policy. See id.
Even courts holding the insured's notice insufficient have indicated that notice with the level of detail found in this case would have been satisfactory. In LaForge, 37 F.3d at 584, the court found the insured's notice insufficient primarily because it was placed in a renewal application rather than a letter purporting to notify the insurer of an occurrence or wrongful act under the policy. The renewal application listed seven loans as "substandard" but included no particulars as to why these loans were substandard or how they might lead to potential claims. See id. By contrast UNB's letters provided VSC with this type of information. In American Casualty Co. v. RTC, 845 F.Supp. 318, 321-22 (D.Md.1993), the insured, Baltimore Federal; provided information in a renewal application that it claimed constituted notice to the insurer, American. However, the renewal application also contained disclaimers indicating that management believed it "has promptly complied with" and is "in compliance with" all obligations of a Supervisory Agreement with federal regulators. Id. at 322. The court held that the information did not qualify as notice because Baltimore Federal could not be seen to provide notice to American at the same time that it was reassuring American that no claims had been filed against it. Id. Yet, the court contrasted this purported notice with a different letter of notice that Baltimore Federal provided under a later policy. See id. at 323. The court found that this later letter constituted sufficient notice to American. See id. The letter indicated that it was intended to provide notice pursuant to the policy and notified *9 American of the potential for claims relating to certain transactions. See id. The letters provided by UNB to VSC in this case provided significantly greater information and detail than this later letter by Baltimore Federal.
Moreover, the court finds VSC's support for its notice argument unpersuasive. VSC heavily relies on American Casualty Co. v. Wilkinson, No. CIV-89-1609-W, 1990 WL 302175 (W.D.Okla. Dec.21, 1990), aff'd sub nom., American Casualty Co. v. FDIC, 958 F.2d 324 (10th Cir.1992), which it claims supports its position regarding the insufficiency of notice. In Wilkinson, the court had to determine whether the notice provided under a bank's directors and officers insurance policy satisfied the policy's notice provisions. See Wilkinson, 1990 WL 302175, at *2. The notice provisions closely resembled those of the D & O Policy in this case. In Wilkinson, the notice provided to the insurer, American Casualty, listed approximately fifty individuals and entities that might have "potential claims against the Association, its Officers, and Directors...." Id. at *3. It also indicated that the bank, Oklahoma Federal, had been named as a defendant in a lawsuit brought by another bank. See Wilkinson, 1990 WL 302175 at *3. The lawsuit against Oklahoma Federal did not name any officer or director of the bank as a defendant. The court held that the notice provided by the insureds was insufficient. See id. at *4.
However, VSC's reliance on Wilkinson is misplaced. Although VSC correctly notes the court's decision and the factors underlying it, VSC's argument fails to recognize important differences between that situation and the present one. In Wilkinson, the court found that the insured failed to provide any explanation as to the circumstances surrounding any alleged impropriety. See id. at *4. The court determined that if an insured merely informs the insurer that claims may be asserted concerning loans to approximately 50 customers, the notice is inadequate. See id. at *4-5.
In the present case, UNB's notice was far more specific. UNB indicated that the APA loans were at issue instead of providing a "laundry list" of potential problems and described how these loans were made. Samuel Foggie Letter of October 13, 1987. UNB notified VSC that the potential claims arising from the APA loans involved improper lending practices. Id. It also indicated the nature of the improper lending practices, providing information regarding loan policy violations, unsafe lending practices, and the fraud involved in these loans. UNB's notice explained how the APA loan problems were discovered, explained that claims could be made against UNB directors and officers, and identified Interdonato as a director.
VSC cites several other cases that it claims establish that the notice provided in this case fell short of that required by the D & O Policy. Some of these cases are "constructive notice" cases in which courts held that information routinely submitted to the insurer and regulatory entities did not qualify as notice. See Ayo, 31 F.3d at 290 (holding that notice provided in the form of regulatory examinations and an auditor's detailed guidelines that were forwarded to or discovered by the insurer did not qualify as notice); FDIC v. Booth, 82 F.3d 670, 677-78 (5th Cir.1996) (holding that constructive notice, in contrast to actual notice, did not satisfy the policy's notice provisions); Artley, 24 F.3d at 1367-68 (holding notice inadequate partly because the notice provided to the insurer was "constructive," purportedly supplied by financial reports and letters to regulatory agencies that documented the poor financial condition of the bank); McCullough, 2 F.3d at 111-12 (holding that a footnote in an annual report provided in conjunction with a policy renewal that referred to a cease and desist order issued to a bank subsidiary by federal regulators was not sufficient notice under the policy). This differs from the actual notice UNB undertook to provide by sending letters to VSC that reported occurrences under the D & O Policy. The courts' decisions in some of these cases are also due in part to specific provisions in the insurance policy relating to the sufficiency of the notice. See Artley, 24 F.3d 1363 (finding insufficient notice on the basis of a specific notice standard derived from the language of the policy's notice provisions); McCullough, 2 F.3d at 112 (judging notice by reference to a heightened "specified *10 wrongful acts" standard)(emphasis added). These differences convince the court that the holding in these cases should not affect the validity of UNB's notice.

B. Waiver
The FDIC also argues that the doctrines of waiver and estoppel prevent VSC from arguing that UNB's notice was insufficient. The FDIC asserts that VSC failed to object to the quality and sufficiency of UNB's letters purporting to provide notice under the policy. It claims that VSC's responses specifically put off discussion of wrongful acts by directors or officers relating to this occurrence. VSC replies that insurance coverage cannot be extended or created by waiver and that because UNB's notice was insufficient, VSC did not have the requisite knowledge to waive notice.
Waiver is "the intentional relinquishment of a known right." New England Mut. Life Ins. Co. v. Seager, 1996 WL 537176, *4 (D.D.C. Sept.13, 1996) (quoting Progressive Cas. Ins. Co. v. Ehrhardt, 69 Md.App. 431, 518 A.2d 151, 157 (1986)). For VSC to have waived its right to notice, it must have acted in a way which would be inconsistent with its intention to enforce that right. Id. The intention to waive a known right may be inferred from the facts and circumstances surrounding a case. Id.
Upon consideration of the parties' arguments, the court finds the FDIC's argument to have merit. This conclusion provides additional support for the court's decision to grant the judgment of condemnation on writ of attachment, indicating that even if UNB's notice to VSC had been insufficient in this case, VSC waived its arguments relating to notice by leading the insured to believe notice was adequate and failing to request further information from UNB regarding director liability.
It is undisputed that VSC knew it had a right to notice. The only disputed issue is whether it acted in a way that was inconsistent with that right. On August 6, 1987 UNB first notified VSC of the possibility of claims against the directors. VSC's response to this letter stated that the D & O Policy could not be implicated because no director or officer had been sued. VSC's response asked UNB to immediately notify it in the event that a director or officer was sued. In its letter dated October 28, 1987, VSC reiterated that the D & O Policy could not be involved since no directors or officers had been sued. These statements implied that UNB did not need to provide any additional notice relating to director liability until a claim had been filed against them. Although both of VSC's responsive letters indicated that VSC reserved all of its rights and defenses to coverage, this boilerplate language fails to inform a reasonable insured of a problem with UNB's notice. To preserve its notice argument, VSC should have indicated its belief that there were deficiencies in the notice provided by UNB's letters. VSC appears to contend that the reason that this was not done is that it believed that only the Spady and Cunningham suits were at issue and that it considered the notice adequate as to these suits. Yet, the letters sent by UNB clearly referred to the possibility of director and officer liability. VSC's failure to properly respond to these asserted notices of possible director and officer liability constitutes a waiver of any arguments relating to deficiencies in notice.
The court's decision in Federal Savings and Loan Insurance Corp. v. Burdette, 718 F.Supp. 649, 653 (E.D.Tenn.1989), is particularly instructive. In Burdette, the court considered the issue of waiver of notice under a directors and officers insurance liability policy. In Burdette, the insured indicated to the insurers, American Casualty Company ("ACC") and MGIC Indemnity Corporation ("MGIC"), in fairly broad language that a claim would be made against "certain former officers and directors." Id. The court noted that the response by ACC and MGIC did not in any way question the sufficiency of notice or request more specific information. Id. The court rejected the insurers' argument regarding lack of notice, stating:
If the notice provided to an insurer is considered by the insurer to be defective, good faith requires the insurer to notify the insured of its objections within a reasonable time, and if the insurer fails to do *11 so or proceeds to act as though notice was satisfactory, it has waived any right to assert notice as a defense at a later date.
Id. Moreover, the court rejected the insurers' argument, similar to VSC's, that it was not aware of deficiencies in notice until later claims were filed. Id. at n. 5. The court concluded that if this position were accepted an insurer "could never be seen to waive objections to notice, as it could always be argued that until a case is filed, an insurer will never know whether notice corresponds to claims subsequently made." Id.
The court also finds Slaughter v. American Casualty Co., 842 F.Supp. 376, 379 (E.D.Ark.1993), rev'd on other grounds, 37 F.3d 385 (8th Cir.1994), instructive in this regard. In Slaughter, the court was similarly faced with waiver of notice issues in relation to a bank's directors and officers insurance policy. See id. at 378-79. With regard to the waiver claim, the court found that the insurer, American, should have informed Slaughter of any problems it perceived with Slaughter's notice under the policy. Id. at 379. The court held that American could not later "be heard to complain that the notice was insufficient." Id.

C. The Release
VSC's strongest arguments in this case relate to the release executed on July 25, 1989, which it asserts releases it from coverage under the D & O Policy. VSC asserts that the release is unambiguous and hence the declarations of the FDIC's experts should not be considered. It argues that UNB released VSC from any and all claims "in any way" relating to the Spady and Cunningham suits. It further asserts that this release was executed on behalf of its directors, eliminating Mr. Interdonato's claim for coverage that the FDIC now asserts. The FDIC presents several arguments in response. First, it argues that the release does not apply to the claim by the FDIC against Interdonato. Second, it asserts that UNB did not have the power to release Interdonato's claims.
The court agrees with VSC that the release is unambiguous and hence declines to consider the evidence of the FDIC's experts nor Paul Ryerson, who negotiated the release for UNB. See FDIC v. Parvizian, 944 F.Supp. 1, 3 (D.D.C.1996) (holding that courts interpreting an unambiguous release must solely rely on the release's "language as providing the best objective manifestation of the parties' intent"). Nevertheless, the court is not convinced that this release bars coverage for the present lawsuit. While VSC strenuously argues that the Interdonato lawsuit must be deemed to "involve" the Spady and Cunningham lawsuits, this court remains unconvinced. The problem is that the Interdonato lawsuit does not involve or arise out of the Spady or Cunningham actions. Rather, this lawsuit involves and arises out of the APA loans.[4] The court would have little trouble accepting VSC's argument if the release were written to act as a release for any and all claims relating the APA loans, but that is not the language of the release that the parties executed. Moreover, the language of the release indicates that it was intended to apply to the claims of UNB against VSC, not claims by its directors or officers.[5]
The court's determination of the scope of the release renders it unnecessary to consider the parties' claims as to whether UNB had the power to release any claims by Mr. Interdonato against VSC. In order to fully address the parties' contentions, however, the court *12 shall briefly address the issue. The court does not find VSC's interpretation of the D & O Policy's Clause VIII.E correct. Read in its entirety, it is clear that the reference in this section to the directors and officers agreeing to allow UNB to act on their behalf relates to the activities discussed in the clause, not any and all activities performed by UNB. The releasing of claims is not one of the activities described and hence VSC should not be permitted to deny Mr. Interdonato's claim on the basis of UNB's release.

D. Prior Acts Exclusion
VSC also claims that the D & O Policy bars coverage for a claim against a director arising out of or in any way involving any wrongful act committed or alleged to have committed prior to October 22, 1986 or any wrongful act occurring on or subsequent to October 22, 1986 that is in any way related to any wrongful act committed or alleged to have been committed prior to October 22, 1986. It argues that because Ms. Spady's wrongful acts were committed prior to this date, Mr. Interdonato's related claims are barred. VSC cites several cases in which courts have found that the actions of one insured barred coverage for a claim against any insured. The FDIC responds that because the D & O Policy contained a severability clause, it constituted a contract with each individual insured and the prior acts exclusion only relates to the prior acts of Mr. Interdonato.
The court agrees with the FDIC that the language of the cases cited by VSC is distinguishable from the present one. This contract does not contain the "any insured" language involved in the policies in those cases, which contrasted policies containing the words "any insured" with policies containing more generic words such as "the insured." See e.g. Michael Carbone, Inc. v. General Accident Ins. Co., 937 F.Supp. 413, 420 (E.D.Pa.1996); Chacon v. American Family Mutual Ins. Co., 788 P.2d 748 (Colo.1990). In this case, the D & O Policy does not contain any reference to indicate to whom the prior acts exclusion applies. In the absence of a phrase expanding the clause's scope, as in the cases cited by VSC, the court finds that the prior acts exclusion, read in conjunction with the severability clause, should only apply to the prior acts of Mr. Interdonato.[6]
VSC also argues that Mr. Interdonato's prior acts bar coverage under the D & O Policy. However, it is clear that the wrongful acts alleged in this action and found by this court to have been committed by Mr. Interdonato, relate to post October 22, 1986 conduct only. Neither the complaint nor this court's December 4, 1996 Findings of Fact, Conclusions of Law, and Order indicate that this action involves prior wrongful acts.[7] The strongest support for VSC's position comes from the December 4, 1996 Findings of Fact, Conclusions of Law, and Order in which this court indicated that by the time JML's acquired UNB, Mr. Interdonato, as a director and member of the audit committee, should have taken appropriate action with regard to the audit report. However, the subsequent sentences indicate that the activities alleged and found by this court refer to *13 those wrongful acts committed by Mr. Interdonato during the period from October 22, 1986 through July 1987. VSC has failed to convince the court that (1) Mr. Interdonato was alleged or found to have committed wrongful acts prior to October 22, 1986 or (2) the wrongful acts that are the subject of this action "in any way" involve any possible prior impermissible conduct by Mr. Interdonato.[8]

E. The Application Exclusion
It also appears that VSC contends that the Application Exclusion precludes coverage under the D & O Policy. VSC argues that because the APA loan problems were known by UNB representatives at the time they signed the policy application, Part C, Paragraph 3 of the application bars coverage. VSC contends that if any insured knew facts that were within the scope of the Application Exclusion, then all insureds' claims should be barred. Referring to its previous arguments, VSC asserts that the Severability Clause does not affect the scope and effect of the application exclusion. The FDIC replies that the Severability Clause applies to the application and prevents the imputation of any knowledge of the other directors to Mr. Interdonato. It also argues that in any event the APA loan problems were not known by UNB representatives at the time the D & O Policy application was completed.
As already discussed the court rejects VSC's interpretation of the D & O Policy's Severability Clause and accepts the contention that it creates a policy with each insured. The court notes that this interpretation is especially strong in this instance because the Severability Clause specifically applies to the "particulars and statements contained in the written proposal and the Exclusion set forth [therein]." See D & O Policy, Section VIII.
Hence, the court shall address Mr. Interdonato's knowledge of the APA loan improprieties. The court finds that the relevant date for determining knowledge should be at the time the application was signed by UNB, namely May 21, 1987, or at the latest the effective date of the policy, July 20, 1987. Mr. Interdonato has testified in his declaration that he had no knowledge of the APA loan problems until after the July 20, 1987 effective date.
Moreover, the court does not find VSC's argument persuasive with regard to the knowledge of UNB and its representatives. VSC cannot act to eliminate coverage by asking the insureds to "re-sign" it after the policy's effective date. Hence, the court does not deem the "re-signing" of the application on August 12, 1987 as determinative. VSC has failed to establish any facts to show that the APA loan problems were known before the signing of the application on May 21, 1987. Thus, the court concludes that the Application Exclusion is inapplicable to bar coverage.

F. Default Judgment
Little needs to be said concerning VSC's last contention. It argues that it should not be bound by the default judgment entered in favor of the FDIC against Mr. Interdonato. It asserts that the dispute was not fairly litigated. VSC made a decision to not defend this lawsuit and it must accept the consequences of that decision. Moreover, the claims against Mr. Interdonato were fairly litigated. Those proceedings are not rendered unfair simply because VSC failed to contest any of the issues.

III. Conclusion
For the reasons set forth herein, the court grants the plaintiff's application and motion for judgment of condemnation on writ of attachment and denies the garnishee's motion to quash and/or deny the writ of attachment on judgment. Separate orders shall issue this date.

ORDER
This matter has come before me on post-judgment garnishment proceedings instituted *14 by the Federal Deposit Insurance Corporation as Receiver of Madison National Bank ("FDIC") pursuant to F.R. Civ. P. 69 and D.C.Code §§ 16-541 et seq., seeking to collect its judgment against the defendant, Paul F. Interdonato by garnishing the Directors and Officers Liability and Company Reimbursement Policy No. 71106 issued by the garnishee Virginia Surety Company, Inc. ("VSC") insuring James Madison Limited, its subsidiaries and their respective directors and officers.
The Court has considered the FDIC's Application and Motion of the Federal Deposit Insurance Corporation as Receiver of Madison National Bank for a Judgment of Condemnation on Writ of Attachment against Garnishee Virginia Surety Company, Inc. ("Application for Judgment of Condemnation") and VSC's Answer and Motion to Quash and/or Deny Writ of Attachment ("Motion to Quash"), and their respective memoranda of authorities, VSC's interrogatory answers, and the declarations and exhibits filed in connection with these motions, and
It is hereby ORDERED, ADJUDGED AND DECREED, for the reasons set forth in an accompanying Memorandum Opinion,
1. That the FDIC's Application for Judgment of Condemnation is hereby granted, and VSC's Motion to Quash is hereby denied.
2. The Court finds that there is no issue of fact to be tried, that the FDIC is entitled to judgment as a matter of law, and that there is no just reason for delay in the entry of judgment.
3. Pursuant to F.R. Civ. P. 69 and D.C.Code § 16-556, the Clerk of this Court is directed to enter judgment in favor of the FDIC against VSC in the amount of $2,844,421.70, plus post-judgment interest from December 4, 1996 through the date of the Judgment pursuant to 28 U.S.C. § 1961.
NOTES
[1] This should be contrasted with an "occurrence" policy, which covers all claims relating to events occurring during the coverage period. In a "claims made" policy notice is a condition precedent to coverage. This notice requirement allows the insured to gain a benefit in the form of lower premiums.
[2] A true claims made policy would only cover claims brought and sufficiently noticed during the coverage period.
[3] Section VII.A of the insurance policy in Artley required the Insureds to give written notice to the Insurer of:

(i) any written or oral notice received by the Insureds from a party stating that the party intended to hold them responsible for wrongful acts, or (ii) any "event or circumstance" of which "the Insureds become aware which may subsequently give rise to a claim being made" against them. To satisfy Section VII.A.(ii), the written notice had to (a) describe the wrongful act, (b) name those persons alleged to have committed the act, and (c) provide the date of the "act or event." Artley, 24 F.3d at 1365.
[4] The fact that both this suit and the Spady and Cunningham suits involve the APA loans does not indicate that they involve each other.
[5] This court recognizes that the rationale of the court in Parvizian is to some extent contrary to this court's determination concerning the scope of the release in the present case. In Parvizian, the court interpreted similar language in a release. See id. at 2. The release applied to litigation arising out of a 1989 Promissory Note, but the court held that it barred litigation resulting from a March 1990 Promissory Note. See id. at 3. The court's decision primarily rested on what it construed as the very broad language of the release and the significant policy considerations favoring the private resolution of disputes through settlement. See id. at 3-4. This court recognizes these considerations but finds that a release settling one lawsuit should not be construed to end all lawsuits arising out of similar factual situations unless the release so indicates.
[6] The Seventh Circuit discussed the effect of a severability clause in Thoele v. Aetna Cas. & Surety, 39 F.3d 724, 727 n. 1 (7th Cir.1994). In Thoele, the court found that it didn't need to consider the effect of the severability clause because the parties had failed to adequately raise the issue. However, the court did note that several courts have relied upon severability clauses to find coverage despite the acts of a co-insured. See id. (citing Premier Ins. Co. v. Adams, 632 So.2d 1054, 1056-57 (Fla.App.1994); Catholic Diocese of Dodge City v. Raymer, 251 Kan. 689, 840 P.2d 456, 461-62 (1992); U.S. Fidelity & Guar. Co. v. Globe Indem. Co., 60 Ill.2d 295, 327 N.E.2d 321, 323 (1975)(some citations omitted)). Other courts have recognized a similar rationale with regard to application exclusions. See FDIC v. Duffy, 835 F.Supp. 307, 315 (E.D.La.1993) (applying Louisiana law and finding that the application exclusion should not be applied separately as to each insured because the policy did not contain a severability clause).
[7] Although VSC points to the Spady complaint as supporting its position that wrongful acts were alleged against Mr. Interdonato in September 1986, the court agrees with the FDIC that this argument strains VSC's credibility. It is clear that the termination referred to in the complaint occurred during September 1987 rather than September 1986. UNB's August 24, 1987 Termination Letter. Other sections of the Spady complaint support this proposition and it is clear that this was a simple error in the complaint.
[8] VSC correctly notes the allegations in the FDIC complaint of Mr. Interdonato's involvement with UNB as a director and as a member of various committees prior to October 22, 1986. However, the complaint does not allege wrongful acts by Mr. Interdonato prior to October 22, 1986. Instead, the FDIC's allegations of improper conduct by Mr. Interdonato were confined to the period subsequent to October 22, 1986.